JAMES H. MORRISON AND MARJORIE A. MORRISON, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2491–74.     Filed January 29, 1979.

*Theodore L. Jones, Gregory A. Pletsch,* and *David Irvin Couvillion,* for the petitioners.
*Robert E. Glanville,* for the respondent.

WILBUR, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for the years 1970, 1971, and 1972 in the amounts of $6,397.72, $32.84, and $2,010.51, respectively. Due to concessions made by the parties, the only issue remaining for decision is whether petitioners have established a basis for Federal income tax purposes in property donated to a university, thereby entitling them to a charitable contribution deduction under section 170(a).[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, a supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference.

Petitioners James H. Morrison and Marjorie A. Morrison are husband and wife who resided in Hammond, La., at the time

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.

their petition in this case was filed. They timely filed joint Federal income tax returns on a cash basis for the calendar years 1970, 1971, and 1972 with the Internal Revenue Service Center at Austin, Tex. Since Marjorie A. Morrison is a party to this proceeding solely by virtue of having filed joint returns with her spouse, James H. Morrison will be referred to as the petitioner.

Petitioner, an attorney by profession, represented the Sixth District of Louisiana in the United States House of Representatives continuously from January 3, 1943, to January 3, 1967. Petitioner participated in 13 election contests for the House of Representatives held every 2 years, the first one occurring in 1942, the last one in 1966. During this period he faced opposition in 10 first Democratic primary contests, 3 second Democratic primary contests, and 2 general elections. Petitioner paid a qualification fee for each nominating primary and general election in which he was a candidate. Petitioner collected campaign contributions through the years that were roughly equivalent to the campaign expenses he incurred.

As is common for a Member of Congress, petitioner incurred many unreimbursed expenses as a direct result of his service in Congress. In 1943, Congress provided each member one round trip per session from his home district, and by 1966, the number of reimbursed round trips had been increased to four. Yet petitioner generally made one trip per week from Washington to his district, or to another location in Louisiana. Additionally, petitioner was required to maintain homes in both Washington and Louisiana, and incurred many other nonreimbursed expenses in meeting with his constituents both in Louisiana and Washington and in participating in various public events that were important for the goodwill and respect of his constituents. Petitioner deducted each year (to the extent allowed under the tax laws applicable at the time) all nonreimbursed expenses related to congressional activities for which he had receipts. For example, a deduction of $9,619.51 was taken on the 1966 return for congressionally related expenses, which included a portion of his living expenses while in Washington performing services as a Congressman.[2]

During his tenure in office, petitioner accumulated and saved

---

[2]The Code provides an overall limit of $3,000 ($250 per month) on the amount deductible for expenses incurred by a Congressman while on business in Washington. See sec. 162(a). This was undoubtedly only a portion of the actual expenses involved.

a large collection of documents, papers, correspondence, memoranda, pictures, mementos, and other memorabilia. At the conclusion of his 24 years in Congress, petitioner's collection of congressional files and assorted legal files were shipped from Washington, D.C., to Hammond, La. The shipping costs were paid, at least in part, by the United States Government. Petitioner also took a deduction on his 1967 income tax return in the amount of $437.60 for the costs he incurred in transporting these congressional and legal records to Hammond.

On September 21, 1970, the petitioner donated his collection of congressional papers and documents to Southeastern Louisiana University, an educational organization described in section 170(c)(2)(B), and located in Hammond, La. This inter vivos transfer of items to the university was unconditional, irrevocable, and unrestricted. The collection of donated items measures approximately 178 cubic feet, most of which is stored on the campus of the donee university. The collection filled 104 large boxes and 34 file cabinet drawers. It also included approximately 10 medium-sized boxes of pictures. A number of the more valuable and cherished items donated, however, were retained by petitioner for display on the walls of his law office. The petitioner valued the contributed collection at $61,100, as of the date of contribution, and such value has been admitted by respondent for purposes of this case.

The property donated by the petitioner consists primarily of items prepared by or for Congressman Morrison in connection with his congressional, political, and related activities, and items prepared by or for third parties, either at their own initiative or in response to congressional communications. Some photographs, mementos, and other memorabilia given to Congressman Morrison were also included in the property donated to the university.

The major portions of items donated are letters (or copies of letters) to or from petitioner and third persons. The letters are generally between petitioner and his constituents or citizens interested in some aspects of governmental affairs. They also include many letters to Government officials in connection with constituent problems and public policy. Very substantial portions of the files concern what is commonly called "casework"— problems constituents experienced with social security, veterans'

affairs, and the military, etc. The collection contains no newsletters, baby books, or high school certificates.[3]

The United States Government provided petitioner with an office in Washington, D.C., during his term of service in the Congress, and provided space for a congressional office in petitioner's home district from approxiamtely January 1948 through January 1967. The office and office space were provided at no expense to petitioner. In addition, the petitioner was provided without charge office equipment and supplies, franking privileges, telephone and telegraph, and air mail postage allowances.

Petitioner was also provided a staff of employees out of the clerk-hire allowance of the United States House of Representatives. This staff was assigned to petitioner to assist him in the performance of his congressional responsibilities, and prepared or assisted in the preparation of the vast majority of the documents included in the contribution to the university.

On his 1970 Federal income tax return, petitioner claimed a charitable contribution deduction for the donation of his congressional papers in the amount of $12,220. Petitioner arrived at this amount by determining that the fair market value of the property donated as of the date of contribution ($61,100), was to be deducted over a 5-year period. Accordingly, petitioner claimed one-fifth of $61,100, or $12,220, as the amount of the deduction for 1970. Petitioner subsequently claimed deductions for charitable contribution carryovers on his returns for 1971 and 1972 for the 1970 donation of his papers in the identical amounts of $12,220. However, because of the percentage limitations on deductions contained in section 170(b)(1)(A), the $12,220 deductions allegedly carried over to 1971 and 1972 were limited by petitioner on the return to $6,792.90 and $11,345.15, respectively.

Respondent disallowed the claimed deductions in their entire-

---

[3]An index about two-thirds complete at the time of trial indicates that the materials are generally stored in numbered boxes by year and subject. The index has entries for "Selective Service"; "Veterans' Administration Claims"; "Servicemen's Requests"; "Coast Guard"; "Post Office Department" (route and years); "Railroad Retirement Board"; "Bureau of Roads"; "Peace Corps"; "Bureau of Public Roads"; "ROTC"; "National Science Foundation"; "G.S.A."; "Social Security"; "Tariff Commission." Another heading relates to "Departments" (FHA, Census, FDIC, etc.). Still other headings deal with subjects—"Holidays," "Hospitals," "Unemployment Compensation," "Visitors to the Capitol," "House of Representatives purses," "Flags," "Scholarships," "State Information Material," "Letters to Committees," and similar entries.

ty on the ground that the contribution did not meet the requirements of section 170.[4]

## OPINION

The sole issue for our decision is whether petitioner is entitled to a charitable contribution deduction for the donation to a university, on September 21, 1970, of documents, papers, correspondence, memoranda, pictures, mementos, and other memorabilia, collected and acquired by petitioner during his 24 years as a member of the United States House of Representatives.

Respondent disallowed the claimed deduction in its entirety on the ground that a gift of such property, after July 25, 1969, is a gift of ordinary income property and the amount so deductible is limited to the taxpayer's basis in the property donated. Respondent found that petitioner had no basis in the contributed property, and was consequently not entitled to a deduction. The allowance of the deduction depends, ultimately, upon whether section 170(e)(1)(A) applies to the property contributed, and if so, whether petitioner can establish a basis in the property donated.

Section 170(a) allows a deduction for charitable contributions to organizations described in section 170(c)(2)(B). Where the charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1). Sec. 1.170A–1(c)(1), Income Tax Regs. Section 170(e)(1)(A) provides that the amount of any charitable contribution of property shall (for periods after December 31, 1969) be reduced by the amount of gain which would not have been long-term capital gain if the contributed property had been sold at its fair market value at the time of the contribution.[5] Consequently,

---

[4]Respondent also disagrees with the methodology petitioner employed in allocating the deduction to various years. Since we conclude no amount is deductible in any event, we do not address this issue.

[5]Sec. 170(e)(1)(A) reads:

SEC. 170 CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(e) CERTAIN CONTRIBUTIONS OF ORDINARY INCOME AND CAPITAL GAIN PROPERTY.—

(1) GENERAL RULE.—The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of—

(A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * *

if a taxpayer donates property which would give rise to ordinary income or short-term capital gain,[6] the allowable deduction is limited to his cost or other basis in such property.

A threshold question regarding the applicability of section 170(e)(1)(A), therefore, is whether the property contributed would occasion a long-term capital gain upon its sale. Since the term "long-term capital gain" is defined as gain from the sale or exchange of a capital asset (sec. 1222(3)), it is necessary to determine whether the property donated by petitioner constitutes a capital asset. A capital asset is defined by section 1221 to include all property held by the taxpayer subject, however, to certain statutory exclusions. Excluded from the definition of capital asset are:

> a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—
> (A) a taxpayer whose personal efforts created such property,
> (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or
> (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B). [Sec. 1221(3).]

In explaining the exclusion of a letter or memorandum, or similar property, from the category of capital assets, the applicable regulations state:

> In the case of sales and other dispositions occurring after July 25, 1969, a letter, a memorandum, or similar property is excluded from the term "capital asset" if held by (i) a taxpayer whose personal efforts created such property, (ii) a taxpayer for whom such property was prepared or produced, or (iii) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of a taxpayer described in subdivision (i) or (ii) of this subparagraph. In the case of a collection of letters, memorandums, or similar property held by a person who is a taxpayer described in subdivision (i), (ii), or (iii) of this subparagraph as to some of such letters, memorandums, or similar property but not as to others, this subparagraph shall apply only to those letters, memorandums, or similar property as to which such person is a taxpayer described in such subdivision. For purposes of this subparagraph, the phrase "similar property" includes, for example, such property as a draft of a speech, a manuscript, a research paper, an oral recording of any type, a transcript of an oral recording, a transcript of

---

[6]We may conveniently refer to such property, as do the regulations, although somewhat incompletely, as ordinary income property. See sec. 1.170A–4(b)(1), Income Tax Regs.

an oral interview or of dictation, a personal or business diary, a log or journal, a corporate archive, including a corporate charter, office correspondence, a financial record, a drawing, a photograph, or a dispatch. A letter, memorandum, or property similar to a letter or memorandum, addressed to a taxpayer shall be considered as prepared or produced for him. * * * [Sec. 1.1221–1(c)(2), Income Tax Regs.]

On the basis of a review of a representative sample of the donated items, and an examination of the catalogue of items donated, we conclude that the items contributed to the university are fairly described in section 1221(3) and the applicable regulation. Sec. 1.1221–1(c)(2), Income Tax Regs. The items contributed by petitioner consist essentially of correspondence, or copies of correspondence, memoranda, and files relating to his congressional activities and constituent matters.

From the index and a sampling of materials submitted by the parties as representative, we conclude that the materials are those typically produced by the office of a Congressman diligently representing his constituents and participating actively in the legislative process. Such items are clearly within the statutory exclusion. We note that third party documents— letters, memoranda, or similar property prepared by third parties (such as constituents, Government employees, or other Members of Congress) and delivered to petitioner—are considered to have been prepared or produced for petitioner. See sec. 1.1221–1(c)(2), Income Tax Regs.; H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 293. The record does not enable us to determine whether any mementos or other memorabilia falling outside the statutory exclusion of section 1221(3) were contributed.

The collection of items is clearly the ordinary income property for which a charitable contribution deduction is expressly disallowed unless the taxpayer can demonstrate that he has incurred out of pocket costs in the creation of the material or acquired a basis in some other manner.[7]

The principal thrust of petitioner's efforts in this case have

---

[7] The present statutory scheme described above is the result of amendments added by secs. 201(a) and 514 of the Tax Reform Act of 1969, 83 Stat. 549, 643. Senator Williams of Delaware, who was instrumental in developing this legislation, had expressed concern about provisions of the law allowing "special tax benefits through the gift of official papers." He stated that "to the extent that they [official papers] do have value, they were developed by Government officials on Government time with the aid of Government staff personnel, were typed by Government secretaries on Government paper, and were even stored in Government files." 115 Cong. Rec. 20461 (1969) (Remarks of Sen. Williams of Delaware).

been aimed at establishing a basis in the property donated to the university. As a consequence, petitioner has developed and presented an elaborate and novel basis theory. Petitioner maintains that as an elected official, he was engaged in the carrying on of a trade or business during the time he held public office. See sec. 7701(a)(26). As such, he contends, his business status was no different from that of any other taxpayer engaged in a trade or business providing services. Petitioner claims that since he was engaged in the trade or business of serving his constituents, he possessed no tangible work product other than the letters, documents, memoranda, and similar materials contained in his congressional files that he contributed to the university.

Petitioner argues that the cost of this tangible work product is attributable in large part to expenditures from his personal resources, and from Government allowances (i.e., the clerk-hire and stationery allowances) disbursed within very broad discretion amounting in substance to a power of appointment. Petitioner asserts that for all the years of his congressional service, his available personal resources ($842,325.81) and Government allowances ($1,319,087.28) total $2,161,413.09. Petitioner claims that $485,800 of this total was used for personal expenses and that the remainder, $1,675,613.09, represents the cost of and his basis in the donated materials.[8]

---

[8]Petitioner's calculations (contested in part by respondent) for his years of service are:

I. PERSONAL RESOURCES:

| | |
|---|---:|
| (1) Congressional salary | $429,999.98 |
| (2) Law practice income | 100,000.00 |
| (3) Income of wife | 175,000.00 |
| (4) Income from parent's estate | 46,000.00 |
| (5) Sale of estate property | 21,500.00 |
| (6) Loans (net of repayment) | 69,825.83 |
| Total personal resources | $842,325.81 |

GOVERNMENT ALLOWANCES

| | |
|---|---:|
| (1) Stationery allowance | 36,100.00 |
| (2) Travel | 14,617.28 |
| (3) Postage | 4,770.00 |
| (4) District office | 9,000.00 |
| (5) Telephone and telegraph | 16,000.00 |
| (6) Clerk-hire allowance | 1,145,000.00 |
| (7) Use value of Washington office | 28,800.00 |
| (8) Use value of District office | 21,600.00 |
| (9) Use value of equipment | 28,800.00 |
| (10) Use value of franking privilege | 14,400.00 |
| Total Government resources | 1,319,087.28 |
| Total resources | 2,161,413.09 |

The following allocation completes petitioner's basis theory:

Petitioner's first basis source for these materials is comprised of funds expended directly from his own personal resources. Petitioner claims that his direct expenditures for the costs attributable to holding public office constitute a cost of producing his congressional files. He specifically points to expenses for travel and lodging related to his congressional duties, expenses for constituent accommodation, expenses for his residence in the District of Columbia, and for other unreimbursed costs he incurred as a Member of Congress, which we concede to be substantial.[9]

Petitioner has failed to show that the claimed expenditures were directly related to the creation of the particular items donated. We fail to see a close nexus between the expenditures incurred and the assets created, a link between the two demonstrating that the expenditures flowed into the assets donated. Cf. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15 (1974). In fact, it is difficult to see any but the most tenuous connection between the expenses of a residence in the District of Columbia and the cost of the specific items donated. Nor do we find the case significantly improved when we focus our attention on unreimbursed expenses for travel, for constituent accommodations, and for similar expenses of the office. A Congressman's business consists of performing services, of "representing" his constituents in Congress. He is not in the business of producing official records. These records, like those of other service businesses, chronicle the services provided. Moreover, such unreimbursed expenses would properly be deductible as trade or business expenses in the year incurred (cf. sec. 7701(a)(26); Rev. Rul. 71–470, 1971–2 C.B. 121), and would therefore not be an ingredient of basis. See sec. 1.1016–2(a), Income Tax Regs. We believe the record demonstrates that petitioner followed the practice of deducting these items currently. Accordingly, petitioner has failed to prove that any of

---

ALLOCATION OF TOTAL RESOURCES

| | |
|---|---|
| (1) Acquisition of personal assets | 100,000.00 |
| (2) Personal living expenses | 360,000.00 |
| (3) Retirement contributions | 25,800.00 |
| (4) Attributable to donated property | 1,675,613.09 |
| Total resources | 2,161,413.09 |

[9]Petitioner also mentions campaign expenditures in this connection, but we believe this is incorrect as he testified that over the years he received campaign contributions approximating campaign expenses.

his expenditures for costs attributable to holding public office are properly included in the basis of the donated property.

Petitioner's second basis source is comprised of the allowances provided Members of Congress. Petitioner argues that he disbursed the funds pursuant to discretion amounting to a general power of appointment, and accordingly these disbursements are a part of his basis. We flatly reject this argument. In generally denying a deduction for the gift of official papers, Congress intended to deny a deduction for papers produced on Government time by Government employees using Government equipment. 115 Cong. Rec. 20461, 20463 (1969); H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 293. Petitioner's theory would not only completely emasculate the statute, but it is diametrically opposed to the view of the matter Congress adopted in enacting the statute in the first place.

Finally, petitioner argues that many of the items, particularly those associated with his campaigns, were gifts to him from third parties and that he assumes a carryover or substituted basis from the donor. We note in passing that the date, time, place, and nature of the gifts (cash or property) is not revealed by the record before us. Neither do we know anything about the "donors" or any basis they may have had in transferred property. However, the fatal impediment to petitioner's forward progress on this issue is his mischaracterization of campaign contributions as a gift. We have recently held that campaign contributions are not gifts and the rationale of that opinion clearly disposes of petitioner's theory. *Carson v. Commissioner*, 71 T.C. 252 (1978).

*Decision will be entered under Rule 155.*