WILLIAM AND MARILYN GLEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4390–81.     Filed August 5, 1982.

William Glen, pro se.
*Rebecca T. Hill*, for the respondent.

SCOTT, *Judge*: Respondent determined a deficiency in peti-

tioners' income tax for the calendar year 1978 in the amount of $2,402. Many of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only whether petitioners are entitled to deduct any amount in excess of that which respondent agrees is allowable as a charitable contribution for the value of tapes of interviews one of the petitioners had with noted scientists.

## FINDINGS OF FACT

Most of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in San Mateo, Calif., at the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1978.

William Glen (petitioner) is a student of plate tectonics. He is, and has been since 1957, an instructor in the Department of Geology at the College of San Mateo and has served intermittently as an instructor in the Department of Paleontology at the University of California at Berkeley. Petitioner is the author of one of the best selling college level textbooks on plate tectonics. This book was published prior to 1977. From 1977 through 1979, petitioner was a student at Union Graduate School, Antioch College, and he received his Ph. D. degree from Antioch in the history of science. Petitioner wrote his doctoral thesis in 1979 on the history of geophysics research, which triggered the development of plate tectonics theory. Both before and while he was doing his research for his Ph. D. thesis, petitioner interviewed the majority of the leading scientists in the areas of atom counting as a procedure for dating rocks, rock fossil magnetism, and magnetism of the rocks of the ocean floor. Scientists working in these three fields had proved the continental drift theory and had triggered the plate tectonics revolution. In addition, petitioner also interviewed some scientists in other earth sciences which were peripheral to geophysics. Petitioner made tape recordings of these interviews with the leading scientists. He used some of the information from these tape recordings for his doctoral thesis and, in addition, he used for his thesis institutional records, personal correspondence, scientific notebooks, memorabilia, photographs, scientific correspondence, and published literature. Petitioner also incorporated a small

portion of the information contained in the taped interviews with the leading scientists into a book which was published shortly before the trial of this case in March 1982. The book is a detailed intellectual scientific history of the plate tectonics revolution.

Petitioner personally conducted the interviews with the scientists and recorded these interviews. Prior to conducting the interviews, petitioner would spend anywhere from several hours to several days in biographical research, reading through all the literature which the scientist to be interviewed had published during his career. This was necessary in order to develop questions for the interview. Petitioner received no compensation either for his preparatory work for interviews or for the time spent in interviewing. Petitioner was in no way compensated for the time he spent in producing the tapes and was not compensated for his out-of-pocket costs, such as travel and related expenses and the cost of the tapes.[1]

In 1978, petitioner donated 62 hours of the tapes he had developed during interviews with the various scientists to the Bancroft Library at the University of California at Berkeley (Bancroft Library). Petitioner retained duplicates of the tapes which he gave to the Bancroft Library. Although petitioner obtained signed copyright release forms from the interviewees in the tapes, it was his understanding that the copyright laws did not protect either his or the interviewees' interests in the tapes.[2] In accepting these tapes, the Bancroft Library agreed that the tapes were going into their archives in perpetuity and that the University would preserve the tapes in perpetuity.

At the time petitioner donated the tapes to the Bancroft Library, the library agreed that the tapes would not be used for a period of 10 years without the permission of petitioner. Petitioner obtained this agreement from the library because he intended to use some of the information contained in the

---

[1] It is the $1 cost per tape and the costs of petitioner's travel and incidental expenses in conducting the interviews that respondent has stipulated is an allowable deduction to petitioner. Our only issue involves any value the tapes may have had in excess of the actual out-of-pocket costs of petitioner for the tapes and the travel and other expenses necessary to develop them.

[2] For the purposes of this case, the parties have stipulated that the copyright laws do not apply to the tapes which petitioner gave to the Bancroft Library.

tapes for portions of a book which he was then planning to publish and which was published shortly before the trial of this case.

There is no market for oral history tapes such as those donated by petitioner to the Bancroft Library. However, several university libraries in the country, in addition to the Bancroft Library, have obtained tapes comparable to those donated by petitioner by employing someone to conduct the interviews. When an individual is employed to do interviews, the cost to the library for his salary and expenses is approximately $100 per hour of taped interview. This cost is based on the time and expenses of the interviewer. The noted scientists who are the interviewees generally do not charge for giving their interviews, and the scientists who are the interviewees in the 62 hours of tapes given by petitioner to the Bancroft Library were not paid by petitioner, or anyone else, for the contribution they made to the production of the tapes.

Petitioner claimed as a deduction on his Federal income tax return for the year 1978 only the travel and incidental costs which he incurred in connection with procuring the tapes. In his petition, petitioner claimed a deduction for $6,200, with the following explanation: "62 Hours of tape recordings donated to U.C. Berkeley verified by formal letter of Deposit by University." The parties agree that if petitioner is entitled to deduct a total of $6,200 for donation of the tapes to the Bancroft Library, he will be entitled to an overpayment of income tax for the year 1978.

OPINION

Section 170(a)[3] allows a deduction for charitable contributions made to organizations described in section 170(c). Where the charitable gift is of property, the amount of the contribution is the fair market value of the property at the time the gift is made, reduced as provided in section 170(e)(1). Under section 170(e)(1)(A), the amount of a charitable contribution of property made after December 31, 1969, is required to be reduced by the amount of gain, other than long-term capital

---

[3]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue.

gain, which would have been realized if the property had been sold at its fair market value at the time the contribution was made. The effect of the provision of section 170(e)(1)(A) is to cause the allowable deduction for property donated, which is not an asset that, if sold, would produce long-term capital gain, to be limited to the taxpayer's cost or basis in the donated property.

Because of the provisions of section 170(e)(1)(A), if the tapes which petitioner donated to the Bancroft Library were not capital assets, petitioner is entitled to deduct only his cost of such tapes, which amount respondent has conceded to be deductible. The parties have agreed on the deductible amount under these circumstances.[4]

Section 1222 provides that the term "long-term capital gain" means the gain from the sale or exchange of a capital asset as defined in section 1221. Section 1221 provides that the term "capital asset" means property held by the taxpayer other than certain excepted property. One of the exceptions is contained in section 1221(3).[5] This subsection provides that a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by a taxpayer whose personal efforts created such property, or in the case of a letter or memorandum or similar property, a taxpayer for whom such property was prepared or produced, is not a capital

---

[4]Petitioner assumed that the fair market value of the tapes at the time the tapes were donated to the Bancroft Library was $6,200. The record is not clear on this point. However, because of the decision which we reach in this case, we will assume for the purpose of discussion that the fair market value of the tapes was the $6,200. However, we in no way intend to be deciding that this record does support a determination that the fair market value of these tapes was $6,200.

[5]Sec. 1221(3) provides as follows:

SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

* * * * * * *

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B) * * *

asset. The facts in this case make it completely clear that the tapes here involved were created by the personal effort of petitioner and the interviewees, and that the tapes were prepared or produced for petitioner. Therefore, under section 1221(3), it is clear that the tapes are not capital assets if they are a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property. Clearly, the tapes are not one of the specifically mentioned items and, therefore, the question is whether they fall within the category of similar property.

We have specifically held that letters or copies of letters to or from a taxpayer and third person and memoranda dealing with problems associated with serving as a Congressman are items referred to in section 1221(3) and, therefore, when contributed to a charity, are deductible only to the extent of their cost or basis to the taxpayer. *Morrison v. Commissioner*, 71 T.C. 683 (1979), affd. per curiam 611 F.2d 98 (5th Cir. 1980). In that case, we referred to the collection of items donated by the taxpayer there involved to a charity as "ordinary income property" and pointed out that a charitable contribution deduction for such property is expressly disallowed except to the extent of the taxpayer's out-of-pocket costs in the creation of the material or his basis therein acquired in some other manner. Similarly, in the instant case, if we conclude, as respondent contends we should, that the tapes donated by petitioner were property described in section 1221(3), we must sustain respondent in his disallowance of the claimed charitable deduction to the extent it exceeded petitioner's cost, which was his basis in the tapes.

Section 1.1221–1(c)(2),[6] Income Tax Regs., provides that—

---

[6]Sec. 1.1221–1(c)(2), Income Tax Regs., provides in part as follows:

(2) In the case of sales and other dispositions occurring after July 25, 1969, a letter, a memorandum, or similar property is excluded from the term "capital asset" if held by (i) a taxpayer whose personal efforts created such property, (ii) a taxpayer for whom such property was prepared or produced, or (iii) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of a taxpayer described in subdivision (i) or (ii) of this subparagraph. In the case of a collection of letters, memorandums, or similar property held by a person who is a taxpayer described in subdivision (i), (ii), or (iii) of this subparagraph as to some of such letters, memorandums, or similar property but not as to others, this subparagraph shall apply only to those letters, memorandums, or similar property as to which such person is a taxpayer described in such subdivision. For purposes of this subparagraph, the phrase "similar property" includes, for example, such

For purposes of this subparagraph, the phrase "similar property" includes, for example, such property as a draft of a speech, a manuscript, a research paper, an oral recording of any type, a transcript of an oral recording, a transcript of an oral interview or of dictation * * *

The tapes here involved are an oral recording of an interview. Therefore, they clearly fall within the definition of "similar property" contained in section 1.1221–1(c)(2), Income Tax Regs. Petitioner does not specifically contend that this regulation is not a proper interpretation of the statute, but, rather, seems to contend that the statute itself is ill-conceived in that it discourages individuals from spending their time and effort in developing tapes and similar property for libraries and other charitable organizations. However, since petitioner's position is not completely clear, we consider it necessary to determine if the regulation does properly interpret the words "similar property" as used in the statute to include tapes of the type petitioner donated to the Bancroft Library.

We conclude that the regulation is a proper interpretation of the statute. The statute is obviously dealing with property created by a taxpayer. A copyright and a literary, musical, or artistic composition are clearly property created by a taxpayer or by a person who might prepare such property for a taxpayer. Similarly, the tapes involved in the instant case are property created by petitioner to the extent that he prepared for and did the interviewing and created by the interviewees for him to the extent that they gave the interview to petitioner without charge. Since the statute is obviously geared to a type of property which a taxpayer himself creates, in our view, the regulation including transcripts of an oral recording or an oral recording of any type or a transcript of an oral interview is a proper interpretation of the similar property referred to in the statute. It is similar to the other items mentioned in that it is a creation by or for the taxpayer. We therefore conclude that the tapes given by petitioner to the Bancroft Library were not

---

property as a draft of a speech, a manuscript, a research paper, an oral recording of any type, a transcript of an oral recording, a transcript of an oral interview or of dictation, a personal or business diary, a log or journal, a corporate archive, including a corporate charter, office correspondence, a financial record, a drawing, a photograph, or a dispatch. A letter, memorandum, or property similar to a letter or memorandum, addressed to a taxpayer shall be considered as prepared or produced for him. * * *

capital assets. Therefore, had these tapes been sold at their fair market value on the date on which they were donated by petitioner to the Bancroft Library, any excess of that amount over the cost of the tapes to petitioner would have been ordinary income to petitioner. For this reason, under the provision of section 170(e)(1)(A), petitioner's charitable deduction is limited to his cost or other basis in the tapes. The parties agree as to the amount of petitioner's cost of the tapes, which is also his basis in the tapes, and that this amount is deductible by petitioner. We sustain respondent in his position that petitioner is entitled to deduct no amount because of donating the tapes to Bancroft Library in excess of his cost basis in the tapes.

Respondent argues, as an alternative, that petitioner should have his claimed deduction for the contribution disallowed under section 170(f)(3) because petitioner donated less than his interest in the tapes. However, respondent does not contend that the amount which he has agreed to be properly deductible should not be allowed to petitioner. Because of our disposition of the primary issue in this case, we do not reach the alternative issue raised by respondent.

Because of the numerous issues disposed of by agreement of the parties,

*Decision will be entered under Rule 155.*