JEFFREY E. GRIFFIN AND BARBARA B. GRIFFIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Griffin v. Commissioner
Docket No. 31824-85.
United States Tax Court
T.C. Memo 1989-130; 1989 Tax Ct. Memo LEXIS 130; 56 T.C.M. (CCH) 1560; T.C.M. (RIA) 89130; March 29, 1989. Thomas W. Tucker, for the petitioners. Linda K. West, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a timely statutory notice of deficiency, respondent determined a deficiency in petitioners' 1981 Federal income tax in the amount of $ 16,427.11. Respondent also determined that the deficiency was attributable to a tax motivated transaction under section 6621(c) [1] and that an increased interest rate applies to the deficiency. After concessions, the sole issue we must decide is the fair market value of a *133 restrictive conservation easement given to a charitable organization. FINDINGS OF FACT Petitioners are husband and wife and resided in New Orleans, Louisiana, at the time they filed their petition in this case. Petitioners timely filed a joint Federal income tax return for 1981. Petitioner Jeffrey Griffin ("petitioner") owned a 24-percent partnership interest in Euphoric Concerns, a Louisiana general partnership formed on October 1, 1981. The purpose of Euphoric Concerns was to acquire, improve, manage, and lease certain property consisting of land and three buildings located in the Lafayette Square Historic District of New Orleans, Louisiana (the "Historic District"). The property was located at 535-545 Julia Street. The Historic District is located in the Central Business District of New Orleans, near the famous French Quarter. Buildings located in the Historic District are regulated by the Historic District Landmarks Commission (the "Commission") of New Orleans. The Commission was created in 1978 to preserve and protect historic landmarks located within the Central Business District of New Orleans. The Commission regulates only building exteriors visible to the public. *134 To assure that buildings within the Historic District maintain their historic value, the Commission must approve all proposed building alterations. The Commission established six categories of buildings (designated Categories A through F). The subject buildings were classified in Category D. Buildings in Category D are described as important, historic buildings that are not in their original condition. They are described by a New Orleans' city ordinance as follows: [Category D] generally includes important buildings dating from the nineteenth century that have had much of their exterior architectural details removed or covered. Due to their scale and basic construction, however, these buildings still make a notable contribution to the overall character of a particular area. If a building in this classification were to be properly restored or renovated, the rating would automatically be raised. In 1981, the subject property (land and buildings) was zoned CBD-7 by the City of New Orleans. Zoning regulations applicable to CBD-7 zoned property provided that -- CBD-7 [zoned property] is to enrich the Central Business District as a whole by providing living accommodations *135 conveniently situated with respect to employment opportunities and supportive of a broad range of commercial and entertainment activities. Residential developments and hotels or motels are encouraged by relatively liberal floor area ratio controls. In appropriate locations within the district off-street parking facilities should be accommodated to serve central business district firms and their employees. Special facade controls are included on street frontages where the maintenance of historic character and scale are important. On December 15, 1981, the land and three buildings located at 535-545 Julia Street were purchased by Euphoric Concerns from the Historic Faubourg St. Mary Corporation ("Historic Faubourg Corporation"). Historic Faubourg Corporation is a Louisiana nonprofit, charitable organization that purchases historic buildings in New Orleans in order to resell the buildings to developers who make commitments to restore the buildings in a manner consistent with their original architectural design. The three adjacent buildings on the property contained approximately 18,336 square feet of gross building area and, on the date of purchase, were vacant and in need of complete *136 renovation. The buildings also had sustained some fire damage. The purchase price agreed to by Euphoric Concerns for the land and buildings was $ 195,000, or approximately $ 10.63 per square foot of gross building area, to be paid by a $ 39,000 cash downpayment and a promissory note executed by Euphoric Concerns in favor of Historic Faubourg Corporation for the balance of $ 156,000. The promissory note was payable in four annual installments of $ 39,000 each, beginning on March 22, 1982, at an interest rate of 10 percent per annum. Closing costs incurred by Euphoric Concerns at the time of purchase were approximately $ 5,000. Also in December of 1981, and as an integral part of the above purchase, Euphoric Concerns and Historic Faubourg Corporation entered into four additional agreements with respect to the purchase of this property by Euphoric Concerns. On December 15, 1981, Euphoric Concerns signed an agreement under which it agreed to restore the historic facade of the three buildings and to renovate the interior. The agreement provided that the obligations created thereunder constituted covenants running with the property and binding on Euphoric Concerns and subsequent *137 purchasers until the required renovation and restoration were completed. Euphoric Concerns deposited $ 100,000 into an escrow account to insure performance of this agreement. On December 30, 1981, Euphoric Concerns and Historic Faubourg Corporation entered into the restrictive conservation easement at issue in this case, referred to as a "Grant of Perpetual Real Right," under which Euphoric Concerns and its successors agreed to preserve and maintain the roof, the facade, the foundation, and the structural support of the three buildings. Also on December 30, 1981, Euphoric Concerns and Historic Faubourg Corporation entered into an amendment to the Agreement to Renovate. Under this amendment, Euphoric Concerns agreed to spend an additional $ 50,000 for the renovation of the interior of the buildings. The record does not indicate the total costs actually incurred by Euphoric Concerns to restore the facade or to renovate the interior of the buildings pursuant to the Agreement to Renovate and pursuant to the amendment to that agreement. The last agreement, dated December 30, 1981, between Euphoric Concerns and Historic Faubourg Corporation consists of a series of restrictive covenants *138 in which Euphoric Concerns agreed to commit approximately one-third of the property to residential use for a period of 10 years. The covenants provided a waiver of the residential-use restriction should all or substantially all of the residential units remain unrented for a period of 12 months after completion. On its 1981 Federal partnership return of income (Form 1065), Euphoric Concerns claimed a charitable contribution deduction in the amount of $ 195,000 with respect to the restrictive conservation easement established with respect to the property in the agreement with Historic Faubourg Corporation of December 30, 1981. On their 1981 joint Federal income tax return (Form 1040), petitioners claimed a charitable contribution deduction of $ 46,800 which represented petitioner's 24-percent share of the partnership's claimed charitable contribution deduction. In his notice of deficiency, respondent determined that the amount of the partners' charitable contribution deductions for 1981 with respect to the facade easement should be limited to the partnership's basis in the facade of the three buildings. Respondent allocated 10 percent of the partnership's total basis of $ 195,000 *139 in the property -- or $ 19,500 -- to the facade. Petitioner's 24-percent share of the partnership's basis in the facade was determined to be $ 4,680 ($ 19,500 times 24 percent). At trial, respondent conceded that Euphoric Concerns' basis in the property should include the $ 150,000 which was placed in escrow for restoration and renovation of the buildings and the $ 5,000 in closing costs incurred by Euphoric Concerns upon purchasing the property. The partnership's basis in the property, as of December 31, 1981, is now computed by respondent to be $ 350,000, and respondent has revised his computation of petitioner's share of the partnership's total basis in the property allocable to the facade easement (namely, 10 percent times $ 350,000 times 24 percent equals $ 8,400). Respondent also determined that the fair market value of the property on the date of the above transactions was $ 350,000 and that the restrictive facade easement caused a 10-percent or $ 35,000 decrease in the fair market value of the property. OPINION The parties agree that the agreement between Euphoric Concerns and Historic Faubourg Corporation with respect to the creation of the restrictive facade easement *140 qualifies as a deductible "qualified conservation contribution" under sections 170(f)(3)(B)(iii) and 170(a)(1). Unresolved is the amount of the contribution. The fair market value of a conservation easement is to be determined on the basis of comparable sales of similar easements. Generally, however, sales of similar easements are not available for comparison and an analysis is made of the "before" and "after" fair market value of the total property, thereby determining the negative effect of the easement on the value of the total property. This difference in value generally is used for the fair market value of the easement. Section 1.170A-14(h)(3)(i), Income Tax Regs., provides in this regard as follows:
(3) Perpetual conservation restriction -- (i) In general. The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution. See § 1.170A-7(c). If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of *141 the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * * The "before and after" approach has been used on numerous occasions to determine the fair market value of restrictive easements with respect to which charitable deductions are claimed. See Symington v. Commissioner,87 T.C. 892, 895 (1986); Stanley Works v. Commissioner,87 T.C. 389, 399 (1986); Hilborn v. Commissioner,85 T.C. 677, 688 (1985); Stotler v. Commissioner,T.C. Memo. 1987-275; Fannon v. Commissioner,T.C. Memo. 1986-572; Akers v. Commissioner,T.C. Memo. 1984-490, affd. 799 F.2d 243 (6th Cir. 1986); Thayer v. Commissioner,T.C. Memo. 1977-370. *142 The "before" value of the property generally reflects the highest and best use of the property in its condition just before the donation of the easement. Hilborn v. Commissioner, supra at 689. The highest and best use of the property in its "before" condition takes into account the manner by which the property likely would have been developed absent the easement. The evaluation of that likelihood also takes into account the effect of existing zoning or historic preservation laws that already restrict the property's development regardless of the existence of the restrictive easement. In estimating the value of the facade easement donated by Euphoric Concerns, petitioners' expert determined that the highest and best use of the subject property before the creation of the easement was for renovation of the three buildings on the property for general office use. [2] Petitioners' expert then obtained sales data for 10 office buildings regarded as being comparable in condition to the subject buildings. Based on this data, petitioners' expert determined that the fair market value of the property (namely, the land and buildings at 535-545 Julia Street) before the creation *143 of the easement was $ 20 per square foot of gross building area, or approximately $ 367,000. [3] Petitioners' expert also used the market data approach to determine that the fair market value of the land before the donation of the easement was $ 172,000. Petitioners' expert's estimate of the "after" value of the property involved a number of steps that are somewhat difficult to follow. He first estimated that the cost to completely and fully restore the three buildings on the property to their highest and best use, including restoration of the facades, was $ 65 per square foot, or approximately $ 1,192,000. *144 To this amount petitioners' expert added his $ 172,000 estimate for the value of the land, and he used the sum of those two figures ($ 1,364,000) as the total "after" value of the property unencumbered by the facade easement. Petitioners' expert then deducted the $ 1,192,000 estimated costs of renovating the property to arrive at $ 172,000 for the fair market value of the property after the easement was associated with the property but before renovations were made. [4]
Petitioners' expert thus calculated that the easement caused a decrease in the fair market value of the property of $ 195,000, as follows: "Before" value of property
$ 367,000 "After" value of property
(172,000)
Diminution in value caused
by easement
$ 195,000 Respondent's expert also determined that the highest and best use of the property without the easement would be to renovate and convert the three existing buildings into commercial office buildings. *145 Also using the market data approach, respondent's expert obtained sales data with respect to eight properties located near the subject property that were in comparable condition. The sales price per square foot of gross building area for the comparable properties ranged from $ 19.35 per square foot to $ 27.21 per square foot. In computing the fair market value of the property before the creation of the easement, however, respondent's expert concluded that the price at which Euphoric Concerns purchased the property from Historic Faubourg Corporation contemporaneously with the creation of the easement (namely, $ 195,000) represented the best indication of the property's fair market value. [5] To this $ 195,000, respondent's expert added the amounts deposited into escrow and the partnership's closing costs to arrive at a "before" value of $ 350,000 computed as follows: Purchase price of property
$ 195,000
Plus:
Escrowed costs
150,000
Closing costs
5,000
Total "before" value
$ 350,000
*146 Using the "before" value of the property, respondent's expert used a diminution factor of 10 percent to determine the fair market value of the facade easement. Thus, respondent determined that the fair market value of the facade easement on December 30, 1981, was 10 percent of $ 350,000, or $ 35,000. The 10-percent diminution factor was based on our opinion in Hilborn v. Commissioner,85 T.C. 677 (1985), in which we allowed a charitable contribution deduction for the donation of a facade easement equal to 10 percent of the "before" value of property on the basis that the easement caused a 10-percent diminution in the fair market value of the property. Respondent's expert also submitted a study entitled "Empirical Study of Sale of Properties Encumbered with Facade Easements or Servitudes." That study was undertaken by respondent's expert in order to determine the impact on fair market value caused by the creation of facade easements with respect to properties located in the French Quarter and in the Central Business District of New Orleans. The valuation dispute before us centers not on the "before" value of the total property (which both experts agree was approximately *147 $ 350,000, and which we conclude was $ 350,000) but on how much the easement adversely affected that "before" value. The answer is not easy nor clear. The estimate of petitioners' expert appears excessive in that it produces a value for the easement of $ 195,000, allocating $ 172,000 to the land and nothing to the buildings. Petitioners argue, however, that the 10-percent diminution factor used by respondent's expert and adopted in Hilborn v. Commissioner, supra, is totally inadequate because it is based on significantly more stringent and preexisting limitations on development that are applicable to properties located in the French Quarter of New Orleans. Petitioners argue that the limitations on development in the Historic District were not nearly so strict and that the easement (not preexisting limitations imposed by the Historic District) reflected the permanent relinquishment by Euphoric Concerns of the right to tear down the existing buildings and to develop the property by constructing thereon a new commercial office building. Petitioners argue, therefore, that the creation of the easement prohibited them from exercising a very real, significant, and valuable *148 development right. Petitioners also point out that by late 1981, the location of the 1984 World's Fair had been announced and was within a mile of the subject property. Petitioners contend that in December of 1981 it was anticipated that the World's Fair would result in substantial development to properties in the Historic District, greatly increasing the value of the right to develop such properties, and therefore greatly increasing the value of the easement which represented the right to develop the property. Petitioners also emphasize that in 1982, respondent's expert made an appraisal of a garage located in the Historic District at $ 52.63 per square foot, based on its development potential. We have no magic wand with which to divine the "true" value of the easement in question. Examining the evidence before us, we can only determine what we conclude to be the best estimate of the value of what the partnership relinquished when it created the easement. We recognize that the subject property is not in the French Quarter and that the development alternatives for this property were more varied than property in the French Quarter. We, however, regard the Historic District, *149 the Commission, and the restrictions applicable to historic properties located within the Historic District to be fundamentally preservation oriented, not development oriented. We believe it doubtful that in 1981 or in the reasonably near subsequent years the buildings on the subject property would have been allowed to be developed in a manner fundamentally inconsistent with their existing architectural character (i.e., we doubt that demolition of the existing buildings and construction of a totally new office building would have been permitted). The facade on the existing three buildings had historic value. That fact explains the purchase of the buildings by Historic Faubourg and why Historic Faubourg, as a condition to the sale of the property, required commitments from Euphoric Concerns relating to renovation (not demolition) of the existing buildings and facade. With regard to the prospect of the 1984 World's Fair being held near the property, the evidence is insufficient to conclude that that prospect increased the likelihood that the property held significant development potential beyond that reflected under the terms of the sale to Euphoric Concerns. We also believe *150 that the appraisal made in 1982 by respondent's expert of a garage property in the Historic District is significantly distinguishable on the grounds that the garage property would not have had the historic value (and therefore the preexisting limitations on development associated with it) that were associated with the subject property. Our evaluation of the totality of the evidence supports a value for the easement of 20 percent of the $ 350,000 "before" value of the property, or $ 70,000. This $ 70,000 value for the easement reflects the limited although increased development potential for this property in the Historic District, as compared to property located in the French Quarter. Petitioners' Deduction Limited to Allocable Basis
Section 170(e)(1)(A), among other things, limits the amount that may be deducted as charitable contributions under section 170(a). It provides that charitable contributions must be reduced by the amount of gain that would not have qualified as long-term capital gain if the donated property had been sold at its fair market value on the date of the donation. [6] In effect, under section 170(e)(1)(A), the allowable charitable contribution *151 deduction for ordinary income property is limited to the basis of the property donated. Lary v. United States,787 F.2d 1538, 1540 (11th Cir. 1986); Glen v. Commissioner,79 T.C. 208, 212 (1982); Morrison v. Commissioner,71 T.C. 683, 688 (1979), affd. per curiam 611 F.2d 98 (5th Cir. 1980). *152 Because the easement in issue was created immediately upon its acquisition by Euphoric Concerns, the long-term capital gain holding period was not satisfied (sections 1222(3) and (4)) and the easement must be treated as ordinary income property governed by the limitations of section 170(e)(1)(A) (i.e., the amount of the total charitable contribution deduction claimed by the partners is limited by Euphoric Concerns' total adjusted basis in the easement). The computation of a taxpayer's basis in partial interests of property donated to charity is governed by section 170(e)(2). [7] That section and the regulations promulgated thereunder provide that the adjusted basis of partial interests in property shall be equal to that portion of the adjusted basis of the entire property which bears the same ratio to the adjusted basis of the entire property as the fair market value of the donated property bears to the fair market value of the entire property. Sec. 1.170A-4(c)(1)(i), Income Tax Regs.[8] Under this regulation, Euphoric Concerns' basis in the easement is computed on the basis of 20 percent of the $ 350,000 fair market value of the entire property or $ 70,000. [9] Petitioner's 24-percent *153 partnership interest in that basis is $ 16,800. The amount of petitioners' allowable charitable contribution deduction for 1981 with respect to the easement is therefore $ 16,800. *154 Addition to Tax Under Section 6621(c)
Section 6621(c) provides for an increased interest on underpayments if there is "any substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year that is "attributable to one or more tax motivated transactions." Secs. 6621(c)(1) and (2). Tax motivated transactions include "any valuation overstatement" as defined in section 6659(c). Sec. 6621(c)(3)(A)(i). Under section 6659(c), a valuation overstatement is present if the value or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct value or adjusted basis of such property. Where the amount of a taxpayer's charitable contribution deduction is limited by section 170(e)(1) to his basis in the donated property, the language of section 6659 is unclear as to whether the valuation overstatement is to be computed on the amount determined to be the taxpayer's allocable portion of the correct fair market value of the donated property or on the amount of the taxpayer's allocable portion of the basis of the property. In this case, we have determined that the fair market value of the facade easement was $ *155 70,000 and that petitioner's portion thereof was $ 16,800. As previously explained, we also have determined that petitioner's portion of Euphoric Concerns' basis in the easement was $ 16,800. We therefore need not decide in this case whether the computation of the valuation overstatement under section 6659, where section 170(e)(1) is applicable, is to be based on the Court's determination of the fair market value of the property or whether it is to be based on the Court's determination of the taxpayer's allocable basis in the donated property. In this case both amounts are the same. Petitioners claimed a charitable contribution deduction on their 1981 tax return in the amount of $ 46,800 with respect to the easement. That amount is more than 150 percent of the amount determined to be the correct value of petitioner's portion of the easement and more than 150 percent of petitioner's basis in the easement. The overstatement also caused an underpayment in tax in excess of $ 1,000. We sustain respondent's determination of the section 6621(c) addition to tax. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. Petitioners also suggested at trial and on brief that in lieu of renovation of the existing three buildings, the three buildings could be demolished and a larger office building constructed. Petitioners, however, have not satisfied the Court that demolition and development of the three buildings was likely, nor was an estimate provided of the fair market value of the property in its "before" condition based on the assumption of demolition and construction of a larger building. ↩
3. $ 20 per square foot times 18,336 square feet of gross building area equals $ 366,720.↩
4. Petitioners' expert's $ 172,000 "after" value for the property is the same as his estimate of the fair market value of the land. Petitioners' expert, in effect, determined that the three buildings on the property had no value.↩
5. In the opinion of respondent's expert, the prices paid for his comparable properties exceeded the approximately $ 10.63 per-square-foot purchase price of the subject property because one-third of the subject property was restricted to residential use and because the subject property had suffered fire damage.↩
6. Sec. 170(e)(1)(A) provides: (e) Certain Contributions of Ordinary Income and Capital Gain Property. -- (1) General rule. -- The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by * * * -- (A) the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), * * * Sec. 1.170A-4(a)(1), Income Tax Regs., also provides: § 1.170A-4. Reduction in amount of charitable contributions of certain appreciated property. (a) Amount of reduction. Section 170(e)(1) requires that the amount of the charitable contribution which would be taken into account under section 170(a) without regard to section 170(e) shall be reduced before applying the percentage limitations under section 170(b) -- (1) In the case of a contribution by an individual or by a corporation of ordinary income property, as defined in paragraph (b)(1) of this section, by the amount of gain (hereinafter in this section referred to as ordinary income) which would have been recognized as gain which is not long-term capital gain if the property had been sold by the donor at its fair market value at the time of its contribution to the charitable organization, * * *↩
7. Sec. 170(e)(2) provides: (2) Allocation of basis. -- * * * in the case of a charitable contribution of less than the taxpayer's entire interest in the property contributed, the taxpayer's adjusted basis in such property shall be allocated between the interest contributed and any interest not contributed in accordance with regulations prescribed by the Secretary. ↩
8. Sec. 1.170A-4(c)(1)(i), Income Tax Regs., provides in relevant part as follows: (c) Allocation of basis and gain -- (1) In general. Except as provided in subparagraph (2) of this paragraph -- (i) If a taxpayer makes a charitable contribution of less than his entire interest in appreciated property * * * and is allowed a deduction under section 170 for a portion of the fair market value of such property, then for purposes of applying the reduction rules of section 170(e)(1) and this section to the contributed portion of the property the taxpayer's adjusted basis in such property at the time of the contribution shall be allocated under section 170(e)(2) between the contributed portion of the property and the noncontributed portion. ↩
9. Because we have concluded that the "before" fair market value of the property is the same as Euphoric Concerns' cost basis in the property, the limitation of section 170(e)(1)(A) has no effect on the amount of the allowable deduction in this case.↩