CONTINENTAL GRAIN COMPANY, TRANSFEREE OF ALLIED MILLS, INC., AS SUCCESSOR BY MERGER TO ELM CREEK ALFALFA MILLS, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Continental Grain Co. v. Commissioner
Docket Nos. 34157-84; 34163-84; 34164-84.
United States Tax Court
T.C. Memo 1989-155; 1989 Tax Ct. Memo LEXIS 155; 57 T.C.M. (CCH) 57; T.C.M. (RIA) 89155; April 10, 1989. *155 In Continental Grain Co., Transferee v. Commissioner,T.C. Memo. 1988-577, we found that the subsidiary (Polo) of petitioner's transferor (Allied) was insolvent for purposes of section 332 on the date of Polo's liquidation. Respondent thereafter moved that we reconsider and revise that opinion, and vacate our decision for petitioner. Held: On the date of its liquidation, Polo was indebted to Allied for interest on intercompany debt. Held further: petitioner is not bound by evidence of fair market value submitted in its behalf which we find unreliable. Held further: respondent's motion will be denied. Howard Smith, *156 Lawrence Weppler, and Richard Bronstein, for the petitioners. Kevin Flynn and Bruce Wilpon, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: This case is presently before the Court on respondent's motions, pursuant to Rules 161 and 162, [2] asking that we reconsider and revise our opinion in Continental Grain Co., Transferee v. Commissioner,T.C. Memo. 1988-577, and vacate the decision for petitioner entered pursuant to that opinion. In our prior opinion, we held that section 332 was not applicable to the liquidation of the subsidiary (Polo) of petitioner's transferor (Allied), as Polo was insolvent on the date of its liquidation. See Spaulding Bakeries, Inc. v. Commissioner,27 T.C. 684 (1957), affd. 252 F.2d 693 (2d Cir. 1958). The facts were set forth in that prior opinion, and are incorporated by this reference. Any additional facts are combined with our opinion below. As grounds *157 for his motion to reconsider, respondent makes two arguments. Respondent first contends that we erred in finding that Polo was indebted to Allied on the date of the liquidation in the amount of $ 83,078 for interest on intercompany debt. Respondent's second contention is that we understated the fair market value of certain assets retained by Allied upon the sale of the assets received in liquidation. After consideration of respondent's arguments, we find no error in our prior opinion. DISCUSSION I. Interest on Intercompany Debt
Respondent argues that the interest on debt owed Allied by Polo is not a liability to be taken into account in determining Polo's solvency. In support of this argument, respondent states that petitioner "unequivocally acknowledged that interest was not accrued (or paid) on the intercompany account * * *." Respondent's argument is based largely upon his belief that we viewed the parties' stipulation with respect to the amount of interest on intercompany debt as a stipulation that such interest was owed; respondent points to the passages in our prior opinion where we state that the stipulated schedule "showed the interest accruing during each of *158 the months and the total interest accrued," and that "accrued interest for [February 1971] was $ 7,224.18." However, the Court was well aware of the dispute between the parties concerning the fact of that obligation. We here reaffirm our findings and conclusions with respect to that dispute. Prior to June 29, 1970, Allied made cash advances to Polo in the amount of $ 4,048,417.36, for purposes of paying certain of Polo's indebtedness and making capital improvements to Polo's plants. On that date, Allied's executive committee resolved that $ 4 million of this sum, which Allied carried on its books as debt, be charged off as a contribution to Polo's capital. The executive committee further resolved that Allied's officers be authorized and directed to draft and execute instruments evidencing a debt of $ 48,417.36, "and that such amount plus any further amounts thereafter advanced to it by this Company shall bear interest at a rate not less than 4% per annum until paid in full." [3] As we stated in our prior opinion, that intercompany debt reached a peak of $ 2,131,956 at the end of February 1971, and stood at $ 426,587 on the date of Polo's liquidation. *159 Respondent's primary arguments with respect to this debt are that no debt instruments were ever drafted or executed in accordance with the resolution and that neither the payment nor the accrual of interest appeared on the tax returns or books and records of either Polo or Allied. We do not agree that these factors preclude a finding that Polo was indebted to Allied for interest on intercompany debt on the date of Polo's liquidation. As a general rule, under Illinois law interest is recoverable only by contract or by statute. [4]Lakefront Realty Corp. v. Lorenz,19 Ill. 2d 415, 167 N.E. 2d 236 (1960). "An implied contract to pay interest may arise when the parties make no express agreement therefor, but from the circumstances the law may infer that they contracted with reference thereto, and interest may be recovered on a contract thus implied as well as on an express contract to pay it." 47 C.J.S. Interest and Usury, sec. 11. The obligation to repay intercompany transfers made between June 29, 1970, and the date of Polo's liquidation necessarily arose by implied contract, *160 as no debt instruments were ever drafted or executed. We think the same is true with respect to interest on those transfers. One of Allied's officers to whom the resolution regarding intercompany debt was directed, Charles H. Peterson (Peterson), was intimately involved in Polo's operations. In April 1970, Peterson became assistant vice-president of Allied's Poultry Division, which oversaw Polo's operations. He remained in that position until February 1971 when he became Polo's senior vice president, a post he held until shortly before Polo's liquidation. These facts are indicative of Polo's knowledge of and acquiescence in that resolution. We think that the fact that no debt instruments were drafted or executed is less a reflection of the existence (or nonexistence) of Polo's obligation than it is of the likelihood, given Polo's track record, that the principal and interest might never be paid. Lastly, we note the arm's-length nature of the dealings between Allied and Polo, *161 and are convinced that, had Polo turned out to be a profitable venture, the interest would have been paid. II. Valuation of Schaumburg Assets
Respondent's second argument concerns the value of items retained by Allied upon the sale of the Schaumburg assets. We stated in note 3 of our earlier opinion that petitioner "conceded" that the assets retained by Allied from both the Schaumburg and New Paris facilities had a value of $ 107,000. Our use of the word "conceded" was ill-chosen, and even if petitioner's posture with respect to those assets were to be construed as a concession, petitioner is not bound thereby, since the record discloses facts clearly to the contrary. During his case in chief, respondent's primary argument with respect to the fair market value of the Schaumburg assets, including assets retained by Allied, revolved around the ASC appraisals, which respondent urged us to accept. The appraisal with respect to all the Schaumburg assets valued those assets at $ 569,835. In support of his argument, respondent submitted the report of Robert Jones (Jones) who also testified at trial. Jones' report concluded that ASC had estimated the value of the Schaumburg *162 assets utilizing a going-concern method of valuation. Jones made his own appraisal, using the same method of valuation and arrived at a valuation not significantly different from that of ASC. However, as we found in our prior opinion, Jones agreed that the going-concern method of valuation was improper, stating that had he "been made aware of all the circumstances, [he] would have advised Allied Mills that a going concern valuation was not an appropriate premise of value * * *." 57 P-H Memo T.C. par. 88,577 at 2989, 56 T.C.M. 900 at 906. We agreed with Jones that an alternate valuation method, based upon the orderly liquidation of the Schaumburg assets, was proper, and found that the fair market value of those assets, including retained assets, was $ 369,000. Respondent argues that our conclusion fails to take into account the value which petitioner itself assigned to the retained assets. Based upon the ASC appraisal, the Schaumburg assets retained by Allied were assigned a value of $ 79,760. Respondent argues that those assets constitute 14 percent of all the assets at Schaumburg. Respondent then states that 14 percent of the orderly liquidation value, $ 369,000, *163 amounts to $ 51,660, the value which we necessarily assigned to the retained assets by virtue of accepting Jones' alternative approach. Respondent argues that petitioner should be bound by the $ 79,760 figure and that Polo's assets should be increased by the difference between the value of those assets under the two different approaches, or $ 28,100. We disagree. Petitioner's argument throughout this proceeding with respect to the fair market value of the assets at both Schaumburg and New Paris was that the best evidence of their value is the subsequent sales of those facilities. In support of its position, petitioner proffered the report and testimony of Charles Gates (Gates), who, according to his report, was asked not to make independent appraisals of Polo's assets, but rather was "retained by [petitioner] to review and critique certain appraisals prepared by [ASC]." Gates' report was based upon information regarding "actual arms-length sales transactions" for the Schaumburg and New Paris assets, and certain "intercompany transfers," involving the retained assets. Petitioner embraced this report throughout these proceedings. However, as stated in our prior opinion, we *164 found Gates' report to be of little assistance, and gave it little weight. We view petitioner's position concerning the retained assets not as a concession as to value, but rather as reliance upon Gates' report. That report, and petitioner's position with respect to the value of the Schaumburg and New Paris assets, is based solely upon subsequent sales. Because the retained assets were not sold, there was no foundation for assigning a value to them. For convenience, both Gates and petitioner adopted the ASC values for those assets, although petitioner stated on brief that the ASC appraisals "are flawed in so many aspects that they are unreliable indicia of fair market value * * *." We therefore view petitioner's position with respect to the retained assets as an explanation of Gates' opinion. Even if we were to accept respondent's argument in theory, we are unconvinced that it has the desired result. Jones' opinion of orderly liquidation value was not broken down on an asset-by-asset basis, as was the case with the ASC appraisal. Therefore we are left to speculate as to the precise value of the retained assets under such an approach. We rejected the going-concern valuation *165 urged upon us by respondent and accepted Jones' orderly liquidation appraisal of the Schaumburg assets because we found it to be the best evidence of those assets in the aggregate. Without evidence of the orderly liquidation value of the retained assets only, we are unwilling to assume that their value under such an approach is $ 51,660 as urged upon us by respondent. The rejection of respondent's argument also has a basis in law. Even stipulated facts may be disregarded "where such facts are clearly contrary to facts disclosed by the record * * *." Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). Petitioner's adoption of the ASC appraisal with respect to the retained assets, which coincides with respondent's position, was based on a going-concern valuation, which even Jones agreed was an improper basis for valuing the Schaumburg assets. As noted above, petitioner adopted that figure simply because the value of the assets retained was small in relation to Polo's total assets, and the ASC appraisals, from which Gates' figures were derived, were the most convenient *166 and expedient way to value those assets. The ASC valuation placed upon the retained assets is clearly contrary to the actual facts, and is not binding. To reflect the foregoing, An appropriate order will be entered.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Continental Grain Company, Transferee of the Assets of Central Nebraska Packing Company and Subsidiary, and Allied Mills, Inc. and Subsidiaries, as Successor by Merger to Central Nebraska Packing Company and Subsidiary, docket No. 34163-84; Continental Grain Company, Transferee of the Assets of, and Successor by Merger to Allied Mills, Inc. and Subsidiaries, docket No. 34164-84.↩
2. All Rule references are to the Tax Court Rules of Practice and Procedure. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. The executive committee's actions were approved in all respects by Allied's board of directors on October 13, 1970.↩
4. During the years in issue, Allied had its principal place of business in Chicago, Illinois. Polo was incorporated in Illinois. We therefore find that insofar as applicable, Illinois law applies.↩