G. PAUL DORSEY, JR. AND KATHLEEN P. DORSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GEORGE P. DORSEY AND MARIE L. DORSEY; LEE CLEMMER DORSEY AND GAYLE J. DORSEY; MARC DORSEY; AND PHILIP J. DORSEY AND MARY D. DORSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dorsey v. Commissioner
Docket Nos. 15133-86, 1715-88
United States Tax Court
T.C. Memo 1990-242; 1990 Tax Ct. Memo LEXIS 247; 59 T.C.M. (CCH) 592; T.C.M. (RIA) 90242; May 17, 1990, Filed Gary J. Elkins, Richard E. Kait, and Jerry F. Palmer, for the petitioners. Linda K. West, for the respondent. PARR, Judge. PARR
*834 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: G. Paul Dorsey, Jr. and Kathleen Dorsey
Docket Nos. 15133-86 and 1715-88
Additions to tax
Year
Deficiency
[1] Sec. 6659 Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 14,445.85
$ 4,333.75
-
-
1982
$ 4,340.20 -
$ 217.01  *
*250 George P. Dorsey and Marie L. Dorsey
Docket No. 1715-88
Addition to tax
Year
Deficiency
Sec. 6659
1981
$ 34,778.46
$ 10,433.54
Lee Clemmer Dorsey and Gayle J. Dorsey
Docket No. 1715-88
Addition to tax
Year
Deficiency
Sec. 6659
1981
$ 7,459.00 $ 2,237.70 Marc Dorsey
Docket No. 1715-88
Addition to tax
Year
Deficiency
Sec. 6659
1981
$ 3,424.00 $ 1,027.20 Philip J. Dorsey and Mary D. Dorsey
Docket No. 1715-88
Addition to tax
Year
Deficiency
Sec. 6659
1979
$ 6,725.30 -
1981
$ 20,883.14
$ 6,264.94 1982
$ 3,978.20 $ 1,165.80 Respondent also determined increased interest pursuant to section 6621(c) [2] against the taxpayers for their respective taxable years *251 1981 and 1982. These cases were consolidated for trial, briefing, and opinion. The deficiencies are attributable to a charitable contribution deduction for a conservation easement petitioners gave to Historic Faubourg St. Mary Corporation (hereinafter referred to as "Historic Corporation"), a nonprofit charitable organization. The issues remaining for decision are whether (1) the fair market value of the donated facade easement is $ 245,000; (2) section 170(e) applies to reduce petitioners' contribution amount; (3) petitioners in both dockets are liable for additions to tax under section 6659 and increased interest under section 6621(c) for taxable year 1981; (4) petitioners in docket *252 No. 15133-86 are liable for the additions to tax under section 6653(a)(1), (2), and increased interest under section 6621(c) for taxable year 1982; (5) petitioners Philip and Mary Dorsey are liable for additions to tax under section 6659 and increased interest under section 6621(c) for taxable year 1982; and (6) petitioners Philip J. Dorsey and Mary D. Dorsey are liable for an increase in their 1979 tax due to a reduction in 1982 of the investment tax credit carryback. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the attached exhibits, are incorporated herein. All petitioners use the cash receipts and disbursements method of accounting. Petitioners G. Paul Dorsey, Jr., and Kathleen P. Dorsey resided in Metairie, Louisiana, at the time they filed the petitions in the above entitled cases. Petitioners George P. Dorsey and Marie L Dorsey; Lee Clemmer Dorsey and Gayle J. Dorsey; and Marc Dorsey, resided in New Orleans, Louisiana, at the time they filed the petition in docket No. 1715-88. *835 Petitioners Philip J. Dorsey and Mary P. Dorsey resided in Metairie, Louisiana, at the time they filed *253 the petition in docket No. 1715-88. During the late 1970's and early 1980's over eight million square feet of new office space in New Orleans, Louisiana, were constructed and readily occupied by major tenants, including oil companies. The demand for additional office space resulted in high rental rates which often exceeded the amount professionals and other office space seekers wished to pay. Accordingly, demand for smaller renovated office buildings increased and office renovation in downtown New Orleans escalated. During this time "Dorsey and Company," petitioners' primary business, occupied office space in one of New Orleans' major office buildings. After 15 years of occupancy petitioners were notified that office space would no longer be available to them on an ongoing basis. Accordingly, they began to look for alternative office space. Petitioners considered acquiring a building in the downtown area because rental rates for comparable office space in that area were relatively inexpensive. As a result, petitioners entered into a "conditional" purchase agreement with Mathilde Fitzpatrick Bowman ("Mrs. Bowman"), to acquire property situated on the corner of Gravier and Magazine *254 Streets in the Picayune Place Historic District of New Orleans, Louisiana (hereinafter referred to as the "Property"). The Property included a three-story improvement believed to have been constructed between 1830 and 1852 and last used as a retail outlet, printing shop, and warehouse. All historically designated buildings within the Picayune Place Historic District are regulated by the Historic District Landmarks Commission (the "Commission") of New Orleans to assure that historic values are maintained. Therefore, owners must seek and receive approval from the Commission before any visible exterior changes are made; i.e., alterations, new construction, and signs. Petitioners retained G. O. Occhipinti ("Mr. Occhipinti"), a structural engineer, to evaluate the costs of acquiring and renovating the Property. In addition, they retained Wayne Collier ("Mr. Collier"), an attorney and real estate developer familiar with facade donations, to discuss with the Commission and Historic Corporation the prospect of making a facade donation. After further consideration and Mr. Collier's recommendation, petitioners concluded that it would be feasible to acquire the Property, make the donation, *255 and renovate the building into first class office space. The events leading to the donation and renovation of the Property were as follows: (1) On November 11, 1981, Barry Fox and Associates, Architects, acting on behalf of petitioners, formally requested the Historic Corporation to consider a facade easement donation of the Property. (2) On November 17, 1981, the Architectural Review Committee of Historic Corporation considered and approved the proposed donation. (3) On November 18, 1981, petitioner Philip Dorsey was informed by Mr. Occhipinti that "in his opinion" it would cost $ 89,900 to restore the exterior of the Property. (4) On December 1, 1981, Ashton B. Avegno ("Mr. Avegno"), a licensed engineer, issued a "Certification of Structural Condition" on the Property, to The McEnery Company, Inc., a professional engineering corporation. The certificate summarized Mr. Avegno's observations and recommendations of the Property's condition and structural soundness. (5) On December 9, 1981, petitioners executed the Articles of Partnership, and formally formed the Gravier Street Partnership (the "Partnership"), a general partnership, under the laws of the State of Louisiana. *256 The Partnership was to "engage in acquisition, holding, owning, improvement, development, and management of immovable properties including construction of buildings, improvements, condominiums, offices and structures of any kind and the disposition and encumbering thereof by sale, lease, mortgage, or otherwise." The Articles of Partnership were filed on December 15, 1981. The partners and their respective partnership interests are as follows: G. Paul Dorsey, Jr.
25%
George P. Dorsey
30%
Philip J. Dorsey
30%
Lee C. Dorsey
10%
Marc C. Dorsey
5%
Philip J. Dorsey is the Managing General Partner. (6) On December 16, 1981, the Partnership, by "ACT OF CREDIT SALE," purchased the Property for the total sum of $ 350,000. [3] Under the terms of the contract the Partnership put $ 25,000 down and obligated itself to make monthly installments of $ 2,953.28 beginning January 1, 1982. In addition to other enumerated obligations, the Partnership obligated itself to commence construction and substantial renovation of the building within 210 days from the date of the sale, in order to convert it to modern *836 office spaces. The contract did not specify the amount *257 required to perform that obligation, nor did the Partnership place any money in escrow to cover its costs. The Partnership also entered into a "cost-plus" agreement with G. C. Occhipinti & Associates, Inc., as general contractor, to construct the renovations. However, the contract did not specify the "cost." (7) On December 22, 1981, the Partnership executed a "Covenant To Renovate" with Historic Corporation. The obligations created thereunder constituted covenants running with the Property and were binding on the Partnership and subsequent purchasers until the required facade restoration was complete. Moreover, the Partnership was obligated to perform the renovations to conform with the plans approved by Historic Corporation and in accordance with the conceptual approval granted by the Architectural Review Committee. To *258 insure full and faithful performance of the Partnership's obligation, Historic Corporation required the Partnership to deliver a letter of credit to it for an amount equal to the construction contract. As of December 22, 1981, the Property was zoned "Central Business District-4" (CBD-4) under the provisions of the Comprehensive Zoning Ordinance of the City of New Orleans (CZO). This classification allowed for a wide variety of retail and service commercial use including business offices. Under the zoning ordinance, the general height limitation in the district was 85 feet, subject to 20-foot set-back requirements. However, properties situated on Gravier and Magazine Streets were subject to 50- and 70-foot height limitations, respectively, on facades facing those streets. Since the Property is located on the corner of Gravier and Magazine Streets it is subject to both height limitations and dual, inconsistent, set-back requirements. Therefore, under a strict application of the zoning requirements, adding two additional floors to the existing structure would produce an extremely narrow and odd-shaped structure, creating undue hardship on its owners. The Board of Zoning Adjustments, *259 however, usually grants set-back restriction waivers in cases where that type of hardship arises. Furthermore, when owners of historic buildings seek the Commission's approval to make exterior changes, the Commission, upon approval of the proposals, usually recommends to the Board or City Council, as the case may be, that a waiver of the height and/or set-back restrictions be granted. Under these circumstances the Board or City Council routinely grants a waiver. [4]
(8) On December 30, 1981, the Partnership entered into the restrictive conservation easement at issue in this case, referred to as a "Grant of Perpetual Real Right," or "facade servitude," with the Historic Corporation. Under the conservation easement (hereinafter referred to as the "Easement" or "facade donation"), the Partnership and its successors agreed to "preserve and maintain the roof, *260 Gravier Street and Magazine Street exterior facade(s), the foundation, and structural support of the property, * * *." The Partnership, pursuant to its obligation under the covenant, executed a $ 90,000 irrevocable letter of credit with the Whitney National Bank of New Orleans, in favor of the Historic Corporation. Certificates of deposit were used to secure the letter. Among many other restrictions contained in the covenant, the Partnership transferred to Historic Corporation all air development rights and all privileges to sell or otherwise trade or bargain for transfer of development rights applicable to the Property. (9) In 1982 the Partnership obtained a short-term construction loan from Whitney National Bank, the proceeds of which were used to complete all renovations (interior as well as exterior) in accordance with both the sales contract and the Covenant to Renovate. Actual renovation of the Property began on April 21, 1982, and by August 27, 1982, restoration was 18 percent complete. (10) Sometime before November 3, 1982, petitioners called upon Hibernia National Bank to permanently finance the short-term construction loan from Whitney. In conjunction with the request, *261 the Bank required petitioners to have the Property appraised. Whereupon petitioners obtained the services of Max Derbes ("Mr. Derbes"), whose name appeared on the bank's list of qualified appraisers. In his report dated November 3, 1982, Mr. Derbes, assuming no easements existed on the Property, appraised the entire Property at $ 1,250,000. Thereafter, the Partnership obtained approximately $ 678,000 in principal financing from Hibernia National Bank. (11) By letter dated December 30, 1982, Mr. G. C. Occhipinti informed the Historic Corporation that the Partnership had either paid or fully deposited monies to cover all costs to complete the renovation of the Property. (12) By December 31, 1982, "Dorsey and Company" moved into the newly renovated building as tenants paying $ 17.50 per square *837 foot in rent annually. Between April 1, 1982, and February 1988, the Partnership spent not less than $ 600,015.07 to renovate the Property, of which not less than $ 511,689.35 was spent between April 1, 1982, and August 30, 1983, and not less than $ 88,325.72 was spent between August 31, 1983, and February 1988. On its U.S. Partnership Return of Income for taxable year 1981, *262 the Partnership listed the following assets and liabilities: Assets
Cash
$ 6,253   Buildings
98,822 Land
151,470 $ 256,545 Liabilities
Mortgages, Notes
$ 334,755 Partners:
Capital Accounts  (78,210)
$ 256,545 Based upon those figures, the Partnership apparently allocated a $ 118,913.16 [5] basis to the donated easement. Furthermore, it claimed $ 245,000 as the fair market value of the charitable contribution to Historic Corporation. Five Schedules K-1 were attached to the Partnership's return for each partner listing each Partner's share of the facade donation as follows: G. Paul Dorsey, Jr
$ 61,250 George P. Dorsey
73,500
Philip J. Dorsey
73,500
Marc Dorsey
12,250
Lee C. Dorsey
24,500
245,000
Petitioners G. Paul Dorsey and Kathleen *263 M. Dorsey deducted $ 41,081 of their share of the charitable contribution on their joint 1981 Federal income tax return and deducted the $ 20,169 carryover on their joint 1982 return. Petitioners George P. Dorsey and Marie L. Dorsey, and Marc Dorsey deducted $ 73,500 and $ 12,250, respectively, on their 1981 Federal income tax return as their charitable contribution. Petitioners Lee Clemmer Dorsey and Gayle J. Dorsey deducted $ 23,633 of their share of the charitable contribution on their joint 1981 Federal income tax return. Petitioners Philip J. Dorsey and Mary D. Dorsey deducted $ 54,068 of their share of the charitable contribution on their joint 1981 Federal income tax return and deducted the $ 19,432 carryover on their joint 1982 return. Respondent determined the Property as a whole had a fair market value of $ 367,500. Moreover, he determined that 10 percent of such value, or $ 36,750, was properly allocable to the donated Easement. Accordingly, respondent issued statutory notices of deficiency to (1) petitioners G. Paul Dorsey, Jr., and Kathleen P. Dorsey, allowing $ 9,187.50 of their 1981 charitable deduction and disallowing the 1982 carryover; (2) petitioners George *264 P. Dorsey and Marie L. Dorsey, and Marc Dorsey, allowing $ 11,025 and $ 1,837.50, respectively, of the 1981 claimed deduction, disallowing the remainder; (3) petitioners Lee Clemmer Dorsey and Gayle J. Dorsey, allowing $ 3,675 of the claimed 1981 deduction and determining they were not entitled to a 1982 carryover; and (4) petitioners Philip J. and Mary D. Dorsey allowing, $ 11,025 of the claimed 1981 deduction, disallowing their 1982 carryover, and determining a $ 6,725.30 deficiency for 1979 relating to a reduction in the investment tax credit carryback from 1982. Respondent concedes that the fair market value of the entire Property and the Partnership's basis therein includes the $ 90,000 letter of credit. Accordingly, respondent now contends that $ 46,000 represents the fair market value of the facade donation. To establish the fair market value of the Easement, each party offered the report and testimony of an expert witness: Charles J. Tessier ("Mr. Tessier") for petitioners, and Irvington J. Eppling ("Mr. Eppling"), for respondent. Mr. Tessier's Valuation: Income Data Approach
Mr. Tessier is a member of the Board of Directors of the Louisiana Realtors Association *265 and the National Association of Realtors, and has been a member and director of the Real Estate Board of New Orleans since 1973. Mr. Tessier also served as Treasurer, Secretary, Vice President, and in 1980, President of the Real Estate Board of New Orleans. He was Chairman of the Louisiana Real Estate Commission for three years and a member of that commission from 1972 to 1981. He is qualified to give an opinion as to the value of an interest in real estate. Mr. Tessier's appraisal, dated July 10, 1982, [6] was written in conjunction with W. John Tessier, [7] *838 using the Income Data Approach to value. *266 In July 1982 relatively little information on appraising facade easements was available. Although the prevailing opinion was that easement grants affected the value of the property involved, the extent to which they did was not really known. Accordingly, Mr. Tessier contacted the Internal Revenue Service (IRS) to obtain information on valuing facade easements. In response, William K. Chance, an IRS engineer agent, sent Mr. Tessier revenue rulings and an article entitled "The Costs of Preservation: The Chicago Plan." [8]
Mr. Tessier, relying in part upon that information, valued the donated easement. In so doing, Mr. Tessier considered the effect existing zoning laws had on the highest and best use of the Property before and after the donation. In his opinion the highest and best use for the Property *267 before and after was a five- and three-story renovated office building, respectively. In order to determine the loss in value occurring as a result of the developmental restrictions, Mr. Tessier analyzed the Property before and after the imposition of the restrictions contained in the Easement. In so doing, he considered the following facts: (1) the facade covered the entire roof, the exterior surface, and its structural foundation; (2) the donation required the Partnership to perform all work Historic Corporation viewed as necessary to preserve and maintain the exterior's facade appearance and character; (3) the Partnership bore all costs for any exterior work required by Historic Corporation; (4) the Partnership was precluded from making any changes to the building's exterior without Historic Corporation's approval; (5) the donation was in perpetuity; and (6) the current use of the Property could not be changed in the future regardless of whether such use was its "highest and best use." After discussions with investors, realtors, and others, Mr. Tessier determined that the rent per square foot for renovated office space ranged between $ 14 to $ 17 per annum. He also *268 determined a capitalization rate of .1125. Mr. Tessier then determined the before and after value of the entire Property as follows: INCOME APPROACH
(Considering "Highest And Best Use")
(Five-Story Building)
Projected Gross Revenue:
16,995 Sq. Ft. at $ 15.00     $ 254,925  Less Estimated Expenses:
$ 63,731   NET INCOME
$ 191,194  Capitalized At .1125:
($ 1,699,502/.1125)     $ 1,699,502
Minus Additional Cost Expense
435,572
BEFORE VALUE BY INCOME APPROACH
$ 1,263,928
INCOME APPROACH
(Considering Three-Story Building)
Projected Gross Revenue
10,197 Sq. Ft. at $ 15.00     $ 152,995  Less Estimated Expenses:
(Taxes, Insurance, etc.)     $ 38,238   NET INCOME
$ 114,717  Capitalized At .1125:
($ 114,717/.1125)     AFTER VALUE BY INCOME APPROACH
$ 1,019,706
He then subtracted the $ 1,019,706 [9] "after" value from the $ 1,263,928 before value to arrive at $ 244,222, the fair market value of the facade donation. Mr. Tessier did not apply an estimated diminution percentage to the before value to arrive at the $ 244,222 fair market value of the donation. [10] Instead he mechanically *269 applied the "before-and-after" method. In an October 4, 1985, supplemental report, Mr. Tessier determined that the before highest and best use of the Property was a six-floor renovated first class office building, and thereafter, concluded that $ 366,583 was the fair market value of Easement. Mr. Eppling's Valuation: Market Data Approach
Mr. Eppling is a member of American Institute of Real Estate Appraisers, Realtors National Marketing Institute (Commercial and Investment Certification), various real estate boards in New Orleans and Louisiana, and the Louisiana Realtors Association. He is qualified to give an opinion as to the value of an interest in real estate. *839 Mr. Eppling prepared a written report, dated November 10, 1987, appraising *270 the Property as of December 30, 1981. Before this appraisal, Mr. Eppling had never appraised a facade easement. Mr. Eppling used the Market Data Approach and the approach outlined in Hilborn v. Commissioner, 85 T.C. 677, 688-690 (1985), to estimate the diminution of value to the Property caused by granting the facade easement. In Mr. Eppling's opinion the highest and best use of the Property was unchanged from its current use, a three-story office building, and he valued the building in its current unrenovated condition. Using seven "comparable sale" properties, Mr. Eppling concluded that the fair market value of the entire Property, as of December 31, 1981, was $ 350,000, or $ 34.32 per square foot. To this figure he added $ 20,000 in acquisition costs and $ 90,000 committed costs (letter of credit) to arrive at $ 460,000 as the "before" value. To arrive at an after value, Mr. Eppling considered the following restrictions: (1) Partnership (grantor) is required to maintain the roof, exterior facade, foundation, and structural support of the property; (2) owner must provide adequate insurance in favor of the grantor and Historic Corporation (grantee); (3) *271 Grantee has the right of ingress and egress for inspections; (4) Grantor conveyed all air development rights; and (5) the easement is perpetual. Mr. Eppling also reviewed the "Empirical Study of Sale of Property Encumbered with Facade Easements or Servitude" [11] and interviewed the vendors and vendees of the properties contained therein. After analyzing the above information and relying on the approach established in Hilborn v. Commissioner, supra, Mr. Eppling estimated that a 10-percent diminution resulted in the "before" value by granting the Easement. Mr. Eppling then multiplied the before value by the 10-percent diminution to arrive at $ 46,000, [12] representing the diminution in the entire market value of the Property and the fair market value of the Easement. *272 OPINION According to the "bundle of rights" theory, complete real property ownership, or title in fee, consists of a group of distinct rights, including development rights. "Each of these rights can be separated from the bundle and conveyed by the fee owner to other parties in perpetuity or for a limited time. When a right is separated from the bundle and transferred * * *, a partial, or fractional, property interest is created." American Institute of Real Estate Appraisers, Appraisal of Real Estate, 109 (9th ed. 1987). It is axiomatic that these rights are acquired along with the property. Thus, a portion of the cost of acquiring said property is attributable to the right to develop the property and all rights that make up the "bundle of rights." "An easement is an interest in real property that conveys use, but not ownership, of a portion of an owner's property." American Institute of Real Estate Appraisers, Appraisal of Real Estate, supra at 120. The value of an easement is estimated as some part of the amount of value it adds to the property it benefits, or the loss in value to the property it burdens. American Institute of Real Estate Appraisers, Appriaisal of *273 Real Estate, supra. Issues on valuing easements generally arise under eminent domain cases where property is "taken" and just compensation made. In those situations the owner's loss is measured by the extent to which governmental action has deprived him of an interest in property. See United States v. General Motors Corp., 323 U.S. 373, 378 (1945). The value of that interest is determined by isolating it as a component of the overall fair market value of the affected property. Kimball Laundry Co. v. United States, 338 U.S. 1 (1949). A facade servitude, for purposes of this case, is deemed to be the equivalent of a common law easement in perpetuity. See Hilborn v. Commissioner, 85 T.C. at 686. Thus, granting a facade easement is a relinquishment of part of the "bundle of rights" held by a property owner. See Nicoladis v. Commissioner, T.C. Memo. 1988-163. Valuation of Facade Easement Donation
In the instant case, the parties agree that the Easement is perpetual, Historic Corporation is a "qualified organization" for purposes of section 170(f)(3)(B)(iii), and the donation of the Easement, having *274 been made to preserve a historically significant structure, qualifies as a deductible "qualified conservation contribution" under sections 170(f)(3)(B)(iii) and 170(a)(1). See sec. 170(h)(4)(A)(iv). Unresolved is the charitable contribution amount. The amount allowable as a deduction with respect to a charitable contribution of property is usually determined by the fair market value of the property donated; i.e., "willing buyer, willing seller," on the date of the gift. Sec. 1.170A-1(c)(2), *840 Income Tax Regs. However, a conservation easement is normally granted by deed of gift; consequently, there is rarely an established market from which to derive fair market value. See Symington v. Commissioner, 87 T.C. 892, 895 (1986). If no comparable sales of the particular type of conservation easement are available, the normal "willing buyer, willing seller" test is difficult to apply. Therefore, the fair market value of the easement for tax purposes will usually be determined indirectly by utilizing the "before-and-after" valuation method, thereby determining the negative effect the easement has on the value of the total property. [13] This method is not *275 to be applied mechanically, however, when other reliable indicators of market value are available. Sec. 1.170-14(h)(3)(i), Income Tax Regs.; S. Rept. No. 96-1007 (1980), 1980-2 C.B. 599, 606. *276 The fair market value of the easement should be based on the highest and best use for the property on its valuation date, including potential development. See generally Stanley Works and Subsidiaries v. Commissioner, supra; Hilborn v. Commissioner, supra; Griffin v. Commissioner, T.C. Memo. 1989-130; secs. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. "Highest and best use" [14] as defined by the American Institute of Real Estate Appraisers is: That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal. Alternatively, that use, from among reasonable probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value. The definition immediately above applies specifically to the highest and best use of land. It is to be recognized that in cases where a site has existing improvement on it, the highest and best use may very well be determined to be different for the existing use. * * * [B. Boyce, Real Estate Appraisal Terminology, 107 (1975).]
*277 In determining the before and after "highest and best use," "The realistic, objective potential uses for the property control the valuation thereof." Symington v. Commissioner, 87 T.C. at 896; Stanley Works and Subsidiaries v. Commissioner, 87 T.C. at 400; Hilborn v. Commissioner, supra. See Olson v. United States, 292 U.S. 246, 255-256 (1934); S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606. Thus, in determining the reasonable and probable use that supports the highest present value we focus on the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." Olson v. United States, 292 U.S. at 255. In determining the "before" value, consideration must be given to the effect of existing historic preservation laws and zoning laws that may already restrict the property's development regardless of the existence of the conservation easement. See Griffin v. Commissioner, supra; Losch v. Commissioner, T.C. Memo. 1988-230. This value is not, however, affected by whether *278 the owner actually intends to put, or has put, the property to its highest and best use before the date of donation. Symington v. Commissioner, 87 T.C. at 897; Stanley Works and Subsidiaries v. Commissioner, supra.
The value of the property "after" the donation must also reflect its highest and best use. Accordingly, consideration of any new restrictions the easement places on the property must be taken into account. Losch v. Commissioner, supra.
A. Highest and Best Use: "Before" and "After"
Both experts agree the before-and-after method should be used to determine the fair market value of the Easement. Furthermore, they agree the highest and best use of the Property after the donation is a three-story renovated office building. They disagree, however, on its highest and best use before the Easement was granted. Petitioners' appraiser, Mr. Tessier, concluded that the most profitable "before" use was a five-story office building. Respondent's appraiser, Mr. Eppling, believed that an increase in the current number of floors was not economically or legally supportable in the near future. He *279 thereby concluded that the highest and best use *841 for the Property was its current use. We agree with petitioners. Petitioners' evidence illustrated that two or three additional floors could be added to the Property after the Commission's approval and after obtaining a waiver of the setback restrictions. They also introduced the testimony of Sandra Levy ("Ms. Levy"), [15] a Commission member, and Evelyn Pugh ("Ms. Pugh"), [16] a former director at the office of Safety and Permits. Their testimony, taken together, establishes to our satisfaction that (1) the Commission would have approved the additions and (2) the Board or City Council would have waived the set-back restrictions. Accordingly, we find it realistic and reasonably probable that two additional floors could have been added to the building, thereby putting the property to its most profitable use. *280 Furthermore, we find that the proposed addition was structurally possible. Although respondent's appraiser testified that he found any floor additions impractical due to the age of the building, Mr. Avegno, Jr., petitioners' witness and a structural engineer, testified that a two- or three-story addition was structurally possible. We find Mr. Avegno's testimony more persuasive on this issue. We also find that the addition was economically feasible. At the time of the donation the Picayune Place District was rapidly becoming a high-density commercial area bringing with it the demand for smaller office space. Based on the foregoing, we are persuaded that the highest and best use of the Property includes an 83-foot by 25-foot by 30-foot addition, [17] representing two additional floors and approximately 4,150 square feet in additional floor space. See Turner v. Commissioner, T.C. Memo. 1977-437; Small v. Commissioner, T.C. Memo. 1969-211; American Institute of Real Estate Appraisers, Appraisal of Real Estate, supra at 272. *281 B. Approach to Valuation
We must decide next whether granting the Easement had any effect on the fair market value of the Property, and if so, the value thereof. The parties use different approaches to arrive at the before-and-after "value" of the Property. Mr. Tessier uses both the Income Data and Cost Data Approaches and concludes that the Income Data Approach is more appropriate. In his opinion the Market Data Approach was inappropriate, since after the Property was renovated no true comparable properties could be found. Mr. Eppling, on the other hand, relies solely on the Market Data Approach. He rejected the Cost Approach saying, it was "based on the principle of substitution and it is unlikely that the demolition of the subject improvements would be allowed, thus reproduction or replacement costs have little relevance." He also rejected the Income Approach saying, it "cannot be used in that comparable rents for unrenovated shell properties were not available." We agree that the Cost Data Approach is inappropriate in these circumstances, since demolition and replacement of a historic building would be highly unlikely. On the other hand, because we are valuing *282 the loss associated with transfer of developmental rights on income producing property, we find the capitalization of income approach an appropriate method to consider. [18]Hilborn v. Commissioner, supra; cf. Estate of Bennett v. Commissioner, T.C. Memo. 1989-681. See J. Eaton, Real Estate Valuation in Litigation, 258-260 (1982); American Institute of Real Estate Appraisers, Appraisal of Real Estate, supra at 120-121. Petitioners allege that a $ 245,000 loss in value resulted from their donation. [19] They further allege that respondent's appraiser *283 improperly applied the before-and-after method since he (1) limited the value analysis to its current use, i.e., an unimproved structure, and (2) failed to compute an "after value" before arriving at the value of the Easement. Respondent contends *842 the loss in value, attributable to the donation, is $ 46,000. [20]
We agree respondent failed to consider the highest and best use of the Property in determining the fair market value of the easement. We also agree respondent did not mechanically apply the before-and-after method. However, a strict mechanical application of the before-and-after method will not always aid in determining the fair market value of a facade easement, especially when the easement involves the relinquishment of two valuable property rights, as *284 it does here. A facade easement is different from an open space easement. In the former, the right to control the exterior of a building is involved while the latter involves no such right. Accordingly, we do not mechanically apply the before-and-after method. See S. Rept. No. 96-1007 (1980), 1980-2 C.B. 599, 606. Valuation is not a precise science, and determining the fair market value of donated property on a given date is a question of fact to be resolved on the basis of the entire record. See McShain v. Commissioner, 71 T.C. 998, 1004 (1979); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). Expert opinion evidence is obviously admissible and relevant on the question of value and is intended to help the Court understand areas requiring specialized training, knowledge, or judgment. We are not, however, bound by the opinion of expert witnesses when, after weighing all the evidence in light of their demonstrated qualifications, their opinion is contrary to our own judgment. Barry v. United States, 501 F.2d 578 (6th Cir. 1974); Kries' Estate v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. *285 a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722, 734-735 (1985). Because we may find one expert more persuasive on one element of valuation and another more persuasive on another element, Parker v. Commissioner, 86 T.C. 547, 562 (1986), we may embrace or reject expert testimony, whenever in our best judgment it is appropriate. Helvering v. National Grocery Co., 304 U.S. 282 (1938). Since the granting of a facade easement is a relinquishment of part of the "bundle of rights" held by a property owner, Nicoladis v. Commissioner, supra, an appraisal should include valuation of all rights attached to the property, including the right to develop the property. American Institute of Real Estate Appraisers, Appraisal of Real Estate, supra at 299. Furthermore, while the price paid for the property may have a bearing on its market value, it is not the investment, but the value of the interest in the property "taken" or donated that is being valued by indirect means. See J. Eaton, Real Estate Valuation In Litigation, supra at 7. In this case petitioners relinquished their rights to *286 (1) put the Property to its highest and best use, i.e., a five-story building, and (2) to some extent, control the exterior of the building. We are, therefore, placed in the position of indirectly valuing these lost rights. After examination of the experts' testimony, their written reports, and the entire record before us, we are persuaded that neither appraisal is flawless. Mr. Tessier (1) overestimated the "before" square footage; (2) failed to take into account vacancy potentials in calculating net income; (3) underestimated expenses; and (4) incorrectly calculated the "Cost Expense" he used to arrive at the "before" value. On the other hand, Mr. Eppling (1) failed to adjust his comparable properties for varying financing arrangements; (2) made a 15-percent downward adjustment to the property most like the subject property without explanation, and more importantly; (3) premised his analysis on the incorrect assumption that the highest and best use of the property was its current use. That is, he failed to consider the loss of development rights. Because of this latter error, Mr. Eppling's report does not aid us in determining the total fair market value of the Easement.
*287 We agree with petitioners that the income approach is appropriate to value the fair market value of the Easement. However, due to the fact that here we are valuing two separate and distinct rights, we believe the method we employ below alleviates any potential problems arising from use of the income approach. [21]
The first step under our method is to determine the fair market value of the Property as of the date of donation; i.e., what a willing buyer and willing seller would agree to on that date. On December 16, 1981, the Partnership paid $ 369,205.16 to acquire the Property. On December 30, 1981, it was irretrievably out-of-pocket another $ 90,000. Both parties agree that the fair market value of the property includes *288 the $ 90,000. There is no evidence that the Property otherwise appreciated in value between December 15th and December 30th. In fact, both parties *843 agree that the Property did not appreciate in value during this time. Accordingly, we find $ 459,205.16 [22] to be the fair market value of the Property as of the date of donation. Our next step is to determine the value attributable to the loss of control over the building's exterior. However, because there are no comparable sales we are constrained to apply a nonmechanical approach of the "before-and-after method." The only evidence presented on the "value" of that right was an amount equal to 10 percent of the Property's total fair market value. We accept it. However, since the right to control the exterior pertains only to the building and not the land, we allocate the total fair market value of the Property between the land and the building. [23] Next we apply the 10-percent *289 diminution to the value allocated to the building. The result is as follows: STEP # 1
BEFORE FAIR MARKET VALUE
$ 459,205.16   Less:
(30,773.52) *
EQUALS - FMV OF PROPERTY
$ 428,431.64   Our final step is to value the loss of development rights. To do so, we first determine the "before" square footage and subtract from it the "after" square footage to arrive at the square footage attributable to the loss of development rights. From that base figure we compute a percentage, the numerator being the "square footage attributable to the lost development rights" and the denominator being the "before" square *290 footage. This gives us a percentage we then apply to the Property's remaining fair market value. The result is the value of the loss attributable to the development rights. With the foregoing in mind, we recompute the easement's fair market value as follows: STEP #2
(1)
BEFORE SQUARE FOOTAGE:
14,287 *
LESS: AFTER SQUARE FOOTAGE:
10,197  EQUALS - SQUARE FOOTAGE ATTRIBUTABLE TO
LOSS OF DEVELOPMENT RIGHTS:
4,090  (2)
4,090 EQUALS 28.63 PERCENT 14,287
The $ 428,431.64 x 28.63 percent equals $ 122,648.92 the value attributable to the loss in development rights. We do not allocate the 28.63 percent between the land and building because the loss of development rights affects the total Property, not just the improvements. Based on the foregoing, we find $ 153,422 [24] *291 to be the total fair market value of the donated Easement. To state it another way, we find approximately a 33.41-percent [25] diminution in the Total fair market value of the Property as a result of the donation. SEE APPENDIX. Charitable Contribution Amount
We must also determine the charitable contribution amount for purposes of section 170(a). Section 170(e)(1)(A) reduces the charitable contribution amount by the amount of short-term capital gain the taxpayer would have recognized if the property donated had been sold at its fair market value on the date of donation. [26]
*292 Since the fair market value and the basis of the Property was the same on the date of donation we find section 170(e) inapplicable. [27] Accordingly, we find $ 153,422 the contribution amount for purposes of applying the limitations under section 170(b). *844 Philip J. and Mary D. Dorsey: ITC Carryback
Petitioners failed to present any evidence on this issue either at trial or in brief. Therefore, we assume that the issue will be resolved in the Rule 155 computation or that petitioners have abandoned it. Additions to Tax
Section 6653
Section 6653(a) provides for an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Negligence is defined as a lack of due care or failure to do what *293 a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). Petitioners bear the burden of proving they exercised due care and were reasonable in their reliance. Rule 142(a). Petitioners had no particular individual expertise in the area of facade valuation and therefore relied on Mr. Tessier's opinion. Mr. Tessier is a qualified appraiser, and there was some support for his report. Under the circumstances of this case, we do not believe petitioners were negligent. Accordingly, we find for petitioners on this issue. Sections 6659 and 6621(c)
Pursuant to section 6659, valuation is overstated if the value of any property claimed on a return is 150 percent or more of the correct amount so determined. Sec. 6659(c). For this addition to apply, the underpayment for the taxable year attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). In the instant case petitioners valued the Easement at $ 245,000. We, however, found $ 153,305 to be the correct value. Therefore, the value of the easement claimed is not 150 percent or more of the correct value. Likewise there *294 is no valuation overstatement for purposes of section 6621(c)(3)(A)(i). Accordingly, we hold that petitioners are not liable for the increased interest under section 6621(c) or the addition to tax under section 6659(d). Decisions will be entered under Rule 155.
Appendix To show how the result above is approximately the same as that under the income method we prepared the following. However, because Mr. Tessier's figures in his initial appraisal were not entirely accurate we make the following changes: (1) Total "before" square footage is 14,287. Total "after" square footage is 10,197. The "before" figure is calculated by taking the actual square footage, 10,197, subtracting from it the 60-square-foot loss in available rental space resulting from adding columns to support the two-floor addition, and adding 4,150, the total usable area of the two floor addition. (2) Fair rental value is $ 16.50 per square foot. (3) Vacancy allowance is 5 percent of the projected gross revenue. (4) Real estate taxes are $ 15,000 plus 29 percent of $ 15,000. (5) Insurance is $ 6,000 plus 29 percent of $ 6,000. (6) Management costs are 5 percent of effective income. (7) Utility *295 expenses are $ 1.25 per square foot. (8) Janitorial expenses are $ 0.55 per square foot. (9) Repairs and maintenance costs are $ 0.12 per square foot. (10) Reserves are $ 1,613. (11) Costs of adding the two floors are $ 71.50 per square foot, i.e., (4,150 X 71.50 = $ 296,725). CAPITALIZATION OF INCOME APPROACH
HYPOTHETICAL BEFORE VALUE
Gross Potential Income
(14,287 sq. feet X $ 16.50)     $ 235,735.50    Less: 5 % Vacancy and Cr. Allowance  11,786.78    EFFECTIVE GROSS INCOME
$ 223,948.72  LESS OPERATING EXPENSES:
Real Estate Taxes     $ 19,350.00
Insurance     7,740.00
Management Costs     11,197.44
Utility Expenses     17,858.75
Janitorial     7,857.85
Repairs and Maint.     1,714.44
Reserves     1,613.00
Total Expenses
$ 67,331.48)    NET INCOME
$ 156,617.24   NET INCOME divided by a .1125
CAPITALIZATION RATE
$ 1,392,153.20  LESS - COSTS OF ADDING TWO FLOORS
($ 296,725.00)   HYPOTHETICAL BEFORE VALUE
$ 1,095,428.20 *
HYPOTHETICAL AFTER VALUE
Gross Potential Income
(10,197 sq. feet X $ 16.50)     $ 168,250.50    Less: 5 % vacancy and Cr.
(8,412.50) EFFECTIVE GROSS INCOME
$ 159,838.00    LESS OPERATING EXPENSES:
Real Estate Taxes     $ 15,000.00
Insurance     6,000.00
Management Costs     7,992.00
Utilities     12,746.25
Janitorial     5,608.35
Repairs and Maint.     1,223.64
Reserves     1,250.00
TOTAL OPERATING EXPENSES  $ 49,820.24     NET RENTAL INCOME
$ 110,017.76  NET RENTAL INCOME divided by a .1125
CAPITALIZATION RATE
EQUALS HYPOTHETICAL AFTER VALUE
$ 977,935.64 *  *296 *845 Subtracting the $ 1,095,428 "before" value from the $ 977,936 "after" value we arrive at an estimated value of $ 117,492. To this we add the $ 30,774 value to arrive at $ 148,266, representing the total loss attributable to the donation. Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code, as amended and in effect for taxable years 1979, 1981, and 1982. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 4,340.20↩
2. The statutory notice of deficiency for G. Paul Dorsey, Jr., and Kathleen Dorsey for taxable year 1982 states sec. 6621(b). However, the correct section is 6621(c). The interest on substantial underpayments under sec. 6621(c) is 120 percent of the interest accruing after December 31, 1984, due on the entire deficiencies.↩
3. The initial purchase price was $ 350,000. Additionally, the Partnership paid $ 1,705.16 in closing costs and $ 17,500 in real estate commissions for a total cost of $ 369,205.16.↩
4. City Council relies heavily on the professional opinion of the Commission when the Commission has reviewed and approved a proposed "construction" plan.↩
5. Cost of land and building ($ 369,205.16) minus the Partnership's basis subsequent to the donation, as reported on its return ($ 98,822.00 plus $ 151,470.00 = $ 250,292.00) equals $ 118,913.16.↩
6. On April 8, 1982 petitioners' expert appraiser, Mr. Tessier, placed a $ 245,000 value on the donated easement. On June 2, 1982, Mr. Tessier placed a $ 118,800 value on the Easement, as of the date the Property was purchased↩, representing 55 percent of the total value of the improvements. Mr. Tessier opined a $ 151,470 value for the land and a $ 216,030 value for the improvements as of the date petitioners purchased the Property for a $ 367,500 total value. However, he failed to include the $ 1,705.16 closing costs, which brings the total value of the Property to $ 369,205.16. 7. Charles Tessier and W. John Tessier, I.F.A., jointly prepared the report dated July 10, 1982. W. John Tessier has been in the profession of appraising all forms of real estate for 31 years and is also a qualified appraiser.↩
8. The Appraisal Journal, July 1974. In this article, John Costonis, the author, concludes that the most appropriate method then available to value conservation easements was the income data approach.↩
9. According to the evidence Mr. Tessier used $ 1,019,500 as the after value to arrive at $ 244,428 as the value of the facade easement. However, the correct figure is $ 1,019,706, which leaves $ 244,222.↩
10. See Hilborn v. Commissioner, 85 T.C. 677↩ (1985).
11. This study was prepared by Mr. Max Derbes for the Internal Revenue Service for a case not presently before this Court. The "comparable" properties therein are not comparable to the subject property; therefore, we do not consider it in reaching our decision on the property here in issue. ↩
12. The $ 46,000 represents 10 percent of $ 370,000 ($37,000) plus 10 percent of $90,000, committed costs, ($ 9,000.↩
13. The before-and-after method is the method recommended by the National Trust for Historic Preservation and the Land Trust Exchange in "Appraising Easements" -- Guidelines for Valuation of Historic Preservation and Land Conservation Easements, 19 (1984) and approved by the IRS. See Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53. The method is also endorsed by Congress in connection with the adoption of the Tax Treatment Extension Act of 1980. See S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606. See Hilborn v. Commissioner, 85 T.C. 677 (1985); Stanley Works and Subsidiaries v. Commissioner, 87 T.C. 389 (1986); Symington v. Commissioner, 87 T.C. 892 (1986); Fannon v. Commissioner, T.C. Memo. 1989-136; Thayer v. Commissioner, T.C. Memo. 1977-370↩.
14. See Olson v. United States, 292 U.S. 246, 255-256 (1934); Stanley Works and Subsidiaries v. Commissioner, 87 T.C. at 402; Symington v. Commissioner, 87 T.C. at 896-897; Continental Grain Co., Transferee v. Commissioner, T.C. Memo. 1988-577, reconsideration denied T.C. Memo. 1989-155↩.
15. Ms. Levy is the director of the New Orleans and Central Business District Historic District Landmarks Commission and has been in that position for the past 12 years. As part of her duties she makes recommendations on behalf of the Commission to the Board of Zoning Adjustments. Some of the Commission's purposes are (1) to establish and improve property values; (2) to foster economic development; and (3) to encourage growth. ↩
16. Ms. Pugh was an assistant city attorney for the city of New Orleans in 1981, and from November of 1982 until May of 1986 she served as director of the department in the Office of Safety and Permits.↩
17. This represents 83 feet in length, 25 feet in width, and 30 feet in height. Accordingly, the total square footage is 14,347, i.e., 10,197 square feet plus 4,150 square feet.↩
18. An appraiser using the income approach views the property in question as would an investor seeking an income-producing property, in this case a commercial office building. The estimate of value is based on a projection of gross income and operating expenses, i.e., net income, over a period of time, discounted to present worth by the capitalization process. Vesper v. Commissioner, T.C. Memo. 1989-358↩.
19. The difference between their estimate of the Property's "before" and "after" values, i.e., $ 1,263,928 and $ 1,019,500, respectively. ↩
20. The difference between the property's "before" and "after" $ 460,000 and $ 414,000 values.↩
21. For example, respondent contends that if petitioners' "before" million dollars-plus value is used to determine the value of the easement then section 170(e) and section 1.170A-14(h)(3)(iii), Income Tax Regs.↩, will apply to reduce the contribution amount.
22. Both parties also agree that $ 459,205.16 is the basis of the property.↩
23. The total fair market value of the Property is $ 459,205.16. Petitioners allocated $ 151,470 to the land. Since there is no evidence to the contrary, we accept that allocation. Therefore, $ 459,205.16 minus $ 151,470 equals $ 307,735.16, the fair market value attributable to the improvements.↩
*. $ 307,735.16 fair market value attributable to the Improvements x 10 percent.↩
*. This figure takes into account the loss of 60 square feet in usable space as the result of having to add additional support columns in the building to support the additional two floors.↩
24. $ 122,648.92 attributable to the loss of development rights and $ 30,773.52 attributable to the loss of control over the exterior of the building, rounded.↩
25. See Higgins v. Commissioner, T.C. Memo. 1990-103↩, (loss of 43.8 percent in value of the property as a result of granting a conservation easement).
26. In effect, the allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated. Lary v. United States, 787 F.2d 1538, 1540 (11th Cir. 1986); Glen v. Commissioner, 79 T.C. 208, 212 (1982); Morrison v. Commissioner, 71 T.C. 683, 688 (1979), affd. per curiam 611 F.2d 98↩ (5th Cir. 1980).
27. The fair market value of the partial interest donated and the basis attributable to that interest are the same. See secs. 1.170A-4(c)(1)(i) and (ii); sec. 1.170A-14(h)(3)(iii), Income Tax Regs.↩
*. We round these figures to $ 1,095,428 and $ 977,936, respectively.↩